Argued and submitted January 20, reversed and remanded April 13, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KRISTINA ANN KAINO-SMITH,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1200951; A156452

371 P3d 1256

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Peenesh H. Shah, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Sercombe, Presiding Judge, and Tookey, Judge, and DeHoog, Judge.

DEHOOG, J.

## DEHOOG, J.

A jury convicted defendant on multiple counts of theft, aggravated theft, and forgery, all arising from defendant's employment as the alleged victim's bookkeeper. Defendant's theory at trial was that she and her husband had been partners in the alleged victim's automobile dealership and, therefore, were entitled to that company's assets. To counter that theory, the state introduced the out-of-court statements of defendant's husband, in which, the state argued, he effectively denied the existence of any such partnership or any claim of right that defendant might have had. Defendant's fourth assignment of error on appeal contends that those statements, when introduced via a tape recording, were inadmissible hearsay. The state responds that the husband's statements were statements against his pecuniary or proprietary interest and, therefore, admissible. We agree with defendant that the statements were hearsay, to which no exception applied, and that the trial court's erroneous admission of that evidence was prejudicial error. Accordingly, we reverse and remand. Because we reverse and remand on those grounds, we do not reach defendant's other assignments of error.

The following historical and procedural facts are undisputed. Defendant and her husband, Kevin Smith, owned "Kevz Karzz," an automobile wholesale business. In 2008, that business began to suffer as a result of the economic downturn, so defendant and Smith went into business selling used cars with the alleged victim, Rick Jones, the owner of Rick Jones Motor Company, Inc. Jones hired Smith as a salesman and hired defendant to work part time as the company's business manager. For a time, Jones paid defendant as an employee, but, around 2009, defendant stopped receiving regular paychecks because the company was losing money. Nonetheless, she continued to work as the company's bookkeeper to help the business stay afloat.

At some point, defendant began writing checks to herself on the corporate account. She deleted those checks from the corresponding "QuickBooks" accounting logs and otherwise altered the company's business records. When defendant's actions aroused the suspicion of another employee,

the employee told Jones that she believed that defendant was writing herself checks and signing Jones's name to them. Jones confronted defendant, who apologized. She told Jones that he could call the police, that she would give him her car to pay him back, and that she would "go to jail." According to Jones's former office manager, defendant also apologized to her for "embezzling money from Rick" and claimed that her medication "caused her to do it." At trial, however, defendant denied having made those statements.

As a result of the foregoing conduct, the state charged defendant with two counts of theft in the first degree, ORS 164.055, five counts of aggravated theft in the first degree, ORS 164.057,[1] and seven counts of forgery in the first degree, ORS 165.013.[2] The jury convicted defendant of all charges. At trial, defendant raised two alternative defenses to the theft charges. Her first defense was that she had written checks to herself under an "honest claim of right," because she had had a rightful claim to the money. Defendant alternatively argued that the money had been her husband's, such that she could not be convicted of theft.[3] Both defenses relied on defendant's theory that she and her husband had formed a partnership with Rick Jones Motor Company, Inc. She argued that their status as partners had entitled them to use partnership assets as they saw fit. She

---

[1] "A person commits theft when, with intent to deprive another of property or to appropriate property to the person or to a third person, the person *** [t]akes, appropriates, obtains or withholds such property from an owner thereof[.]" ORS 164.015(1). Theft in the first degree requires proof that the property stolen was worth at least $1,000, ORS 164.055(1)(a), while aggravated theft in the first degree requires proof that the property was worth at least $10,000, ORS 164.057(1).

[2] As relevant here, a person commits forgery in the first degree "if, with intent to injure or defraud, the person *** [f]alsely makes *** a written instrument," ORS 165.007(1)(a), and "the written instrument is or purports to be *** [a] check for $1,000 or more," ORS 165.013(1)(a)(D). A person "[f]alsely makes *** a written instrument" if the person makes "a complete written instrument in its entirety, *** which purports to be an authentic creation of its ostensible maker, but which is not, either because the ostensible maker is fictitious or because, if real, the ostensible maker did not authorize the making *** thereof." ORS 165.002(4).

[3] It is a defense to theft "that the defendant acted under an honest claim of right, in that *** [t]he defendant reasonably believed that the defendant was entitled to the property involved or had a right to acquire or dispose of it as the defendant did." ORS 164.035(1). In addition, "[i]t is a defense that the property involved was that of the defendant's spouse." ORS 164.035(4).

further argued that, even if they had not, in fact, been partners, she at least had reasonably *believed* that they were. As for the forgery charges, defendant argued simply that Jones had authorized her to withdraw money from the company account and sign his name to the checks. *See* ORS 165.002(4) (requiring, for forgery, that the falsified written instrument be unauthorized).

Defendant and the state introduced competing testimony regarding the nature of the business entity. Jones testified that he had considered both Smith and defendant to be his employees; he had not considered either one to be a partner in the business. Jones acknowledged that he and Smith had split the profits from selling vehicles and that he had referred to Smith as his "partner." However, that was, in his words, simply because he had not wanted Smith to feel like an "underling." Notably, the defense called several witnesses to impeach Jones's testimony.

For her part, defendant testified that she and her husband had had a number of businesses together and that she had always considered herself to be a partner in those businesses. Smith, on the other hand, asserted his spousal testimonial privilege and did not testify. Defendant also called two witnesses—one of the drafters of Oregon's partnership statutes and a small-business lawyer—to explain how partnerships are formed. Both witnesses testified that partnerships can form by operation of law, *i.e.*, without formal agreement, and that various factors may result in the creation of a partnership, whether or not the persons involved intend to form a partnership.[4] That testimony served as the basis of defendant's trial strategy, in which she argued that the business had been a partnership, even if Jones had never intended to bring Smith and her on as partners.

---

[4] In addition to intent, factors that may indicate that a partnership has been created include such things as shared profits, joint participation in the control of the business, shared liability for the business's losses and debts, and the contribution of money or property to the business. ORS 67.055(1), (4). The state did not object to defendant's reliance on partnership principles to justify her conduct, and we express no opinion on whether a partnership existed under the circumstances described or whether the potential existence of a partnership would have licensed that conduct.

To undermine defendant's partnership theory, the state introduced evidence of a pretext call that Jones made to Smith as part of the police investigation. During that phone call, Smith made various statements that the state argued were, in effect, acknowledgments that there had been no partnership and that defendant had not been entitled to withdraw money or sign Jones's name to any checks. For example, Smith said, "I didn't even know she was on your account, Rick," which the state argued contradicted defendant's argument that a partnership had been formed. Another statement implied Smith's belief that he, himself, had been paid strictly as an employee, which the state relied on as evidence that defendant, too, had merely been an employee and not a partner. In yet another statement, Smith denied that any of the money that defendant had taken had gone into the Kevz Karzz account, which, according to the state, tended to counter defendant's argument that the partnership she had shared with Smith had itself been in partnership with Jones or Rick Jones Motor Company, Inc.

Significantly, most of the statements that Smith and Jones made during the call had no bearing on whether or not there had been a partnership.[5] Instead, both Smith and Jones repeatedly accused defendant of forging checks and stealing money, which, the state argued, indicated that neither of them believed that defendant had any right to the money that she took.

The state presented evidence of Jones's phone call to Smith in two forms. First, the state elicited testimony regarding Smith's part of the call during the state's redirect examination of the investigating detective, Eggleston. Over defendant's hearsay objection, the trial court allowed Eggleston to recount Smith's statements that defendant had placed the money she had taken "right into her account, $116,000"; that defendant "did not put any money in Kevz Karzz, none at all"; that Smith "did not know that she had

---

[5] Arguably, *none* of the statements that either Smith or Jones made was an obvious reference to the existence of a partnership. However, the state, defendant, and the trial court all characterized much of the recorded conversation that way, apparently based upon the inferences that the state argued arose from that evidence. For purposes of our analysis, we accept that characterization for at least some of the statements.

taken the money"; and that, at the time of the phone call, Smith had "an idea what she ha[d] taken" and knew "what she ha[d] done with some of the money, which ma[de] no sense." The trial court admitted those four statements on the apparent theory that defendant had opened the door to that evidence. *See Wynn v. Sundquist*, 259 Or 125, 136, 485 P2d 1085 (1971) ("[W]here one party offers inadmissible evidence, which is received, the opponent may then offer similar facts whose only claim to admission is that they negative or explain or counterbalance the prior inadmissible evidence, presumably upon the same fact, subject matter or issue."). Over defendant's further objection on relevance grounds, the trial court allowed Eggleston to testify that Smith had said that he "didn't know [that] she was spending money on credit cards for stuff other than office supplies."[6]

Second, the state introduced the recorded phone call itself, which it played for the jury. In anticipation of defendant's hearsay objections, the state argued that the contents of the recorded phone call were admissible under various hearsay exceptions. As relevant here, the state's primary argument was that Smith's recorded statements were admissible under the hearsay exception for statements against pecuniary or proprietary interest, OEC 804(3)(c). Notably, the state indicated that its primary purpose in offering Smith's statements was to undermine defendant's theory that Jones or anyone else had authorized her use of the company's money.

The trial court agreed with the state that Smith's recorded statements were admissible under the hearsay exception for statements against a declarant's pecuniary or proprietary interest. As the court characterized them, "the statements that he made [were] so far at odds with his rights as a partner" that they were contrary to his pecuniary and proprietary interests in the alleged partnership. Accordingly, the court admitted those statements. Moreover,

---

[6] The trial court admitted the final statement over defendant's hearsay objection, on the theory that the statement was a "verbal act." *See Hickey v. Settlemier*, 318 Or 196, 204, 864 P2d 372 (1993) ("Some statements are themselves significant legal facts, that is, the substantive law attaches certain consequences to utterances so that the mere making of the statement becomes an issue in the case.").

even though Smith made relatively few statements arguably related to *his* potential partnership interest, the court admitted the entire phone call based on the admissibility of the few statements that were. *See State v. Brown*, 310 Or 347, 358-59, 800 P2d 259 (1990) (when the opponent of evidence does not segregate inadmissible from admissible portions of the evidence, the evidence as a whole is admissible if any portion was properly admissible). Throughout the balance of the 12-minute recording, Smith and Jones repeatedly accused defendant of theft; Jones also specifically undermined defendant's forgery defense.

At the close of evidence, several days later, the trial court limited the jury's use of the phone call evidence. The court instructed the jury, "As to the tape-recorded conversation between Rick Jones and Kevin Smith, you may consider it only to assess whether Mr. Smith's conduct or his statements were consistent or inconsistent with a partnership relationship between Mr. Jones, Mr. Smith, and the defendant."

With that background in mind, we focus our analysis on the trial court's admission of the evidence about the recorded phone call as a statement against Smith's proprietary or pecuniary interest. Defendant does argue on appeal—as before the trial court—that all of Eggleston's testimony regarding Smith's statements was inadmissible hearsay. However, with respect to the first four of those statements, defendant does not challenge the actual basis on which the court admitted them—that defendant had opened the door to that testimony. Accordingly, defendant's arguments do not present any reason for us to disturb the court's ruling regarding the testimony about those four statements.[7] We conclude that, even in light of those statements, the court's admission of the recorded phone call itself was reversible error.

We note that, on appeal, the parties apparently agree that the recorded statements were hearsay. We agree with that premise. "'Hearsay' is a statement, other than

_____

[7] As for the fifth such statement, which the trial court admitted over defendant's hearsay objection on the grounds that it was a "verbal act," the trial court's ruling does not affect our analysis. Therefore, we do not decide whether that ruling was in error.

one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3). Hearsay is inadmissible "except as provided in [OEC 801] to [OEC 806] or as otherwise provided by law." OEC 802. Whether evidence is hearsay is a question of law. *See Timber Access Ind. v. U. S. Plywood*, 263 Or 509, 515, 503 P2d 482 (1972) (applying that standard of review).

Here, the state offered Smith's recorded statements for their truth. The trial court instructed the jury to consider the recorded statements for their bearing, if any, on whether, in fact, a partnership had been formed. Those out-of-court statements could support the state's position—that there had been no partnership—only if they were true; that use of the statements rendered them hearsay. For example, the state offered Smith's statement, "I didn't even know she was on your account." The state's apparent purpose for offering that statement—and the one on which the trial court ultimately relied—was that it supported the inference that Smith believed the corporate account belonged to Jones, alone, and not in partnership with defendant and Smith. In turn, that belief arguably supported the state's desired conclusion that defendant, in fact, held no partnership interest in any assets of Rick Jones Motor Company, Inc. While the state's ultimate purpose in offering Smith's statement ("I didn't even know she was on your account") was to prove a different fact (that there had been no partnership), Smith's statement would be probative of that ultimate fact only if his statement were true. That rendered Smith's out-of-court statement hearsay.[8] Accordingly, we examine those out-of-court assertions, as well as similar statements made during the pretext call, in light of the hearsay exception for statements against interest.

We apply a "two-part standard of review to a trial court's evidentiary ruling that a statement fits within an

---

[8] In more concrete terms, Smith's statement that he "didn't even know she was on [Jones's] account" would help prove that there had been no partnership only if Smith's statement were true, *i.e.*, if he really had not known that defendant was on the account. Accordingly, we must evaluate that statement for its hearsay implications. *See State v. Reid*, 107 Or App 352, 356, 811 P2d 1380 (1991) (out-of-court statement introduced to impeach a witness was hearsay when the impeachment value of the statement depended on its truth).

exception to the hearsay rule." *State v. Cook*, 340 Or 530, 537, 135 P3d 260 (2006). First, we "will uphold the trial court's preliminary factual determinations if any evidence in the record supports them." *Id.* "We view the record consistent with the trial court's ruling on a preliminary question of fact under OEC 104(1), accepting reasonable inferences and reasonable credibility choices that the trial judge could have made." *State v. Carlson*, 311 Or 201, 214, 808 P2d 1002 (1991). "[I]f the trial court does not make findings on pertinent historical facts * * *, this court will presume that the trial court found facts in a manner consistent with its ultimate conclusion." *Id.* Second, we review "the trial court's ultimate legal conclusion, as to whether the hearsay statement is admissible under an exception to the hearsay rule, to determine if the trial court made an error of law." *Cook*, 340 Or at 537.

As noted, the trial court admitted Smith's recorded statement under the hearsay exception for statements against the declarant's pecuniary or proprietary interest, OEC 804(3)(c). To be admissible, such a statement, "at the time of its making," must have been "so far contrary to the declarant's pecuniary or proprietary interest * * * that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." OEC 804(3)(c).[9] That requirement presents a preliminary question of fact to be decided by the trial court under OEC 104(1). *State v. Nielsen*, 316 Or 611, 635, 853 P2d 256 (1993). The rationale underlying the exception for such statements is that a "statement against interest carries a circumstantial guaranty of reliability, because people generally do not make statements that are damaging to their interests unless they believe they are true." Legislative Commentary to OEC 804(3)(c), *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 804.04[2], 912 (6th ed 2013).

The state argues that the contents of the phone call were admissible because Smith "failed to claim any

---

[9] The rule also requires that the declarant be "unavailable" as a witness. OEC 804(3). The parties do not dispute that Smith made himself "unavailable" by asserting his spousal testimonial privilege. *See* OEC 804(1)(a) (declarant is unavailable if he or she is exempt from testifying "on the ground of privilege"); OEC 505(3) (spousal testimonial privilege).

partnership interest in the funds at issue" and "characterized any money he received as compensation for work." In the state's view, "those statements were totally at odds with those that a reasonable person would make if he or she had an ownership interest in the disputed property." However, that argument relies on a factual predicate—that Smith was aware that his statements were against his interest—that lacks support in the record.

Before a hearsay statement may qualify as a statement against interest, there must "be some evidence, or at least an inference which could be drawn from that evidence, which indicates that the declarant realized that the statements were against his pecuniary interest at the time they were made." *Reynoldson v. Jackson*, 275 Or 641, 645, 552 P2d 236 (1976). That factual predicate is essential, because a statement against interest loses its reliability if the declarant did not appreciate the statement's potential detrimental impact. Kirkpatrick, *Oregon Evidence* § 804.04[3][a], 914.

*Reynoldson* illustrates that principle. In *Reynoldson*, the Supreme Court considered the admissibility of a pedestrian's out-of-court statement that he and the plaintiff, who was his sister, had been crossing a street outside of an intersection when the defendant's car struck his sister. 275 Or at 643. That statement tended to prove that the defendant driver had had the right of way. *Id.* at 643-44. The defendant argued that the statement was an admissible statement against the pedestrian's pecuniary interest, because it jeopardized his own ability to claim damages for the accident. *Id.* at 644-45. The court disagreed, reasoning that "[t]here was absolutely no evidence" that the pedestrian had recognized that the statements were against his pecuniary interest at the time he made them. *Id.* at 645. The pedestrian had not been injured himself in the accident, so "any pecuniary interest he might have had as a result of the accident would be speculative and remote." *Id.* In addition, the pedestrian was 89 years old, "slightly confused," and, evidently, a layperson. *Id.* at 644. Thus, the court concluded that it was "doubtful that he would have further realized that he was impairing [any pecuniary] interest by placing the site of the accident where he presumably did." *Id.* at 645.

Returning to this case, "[w]e view the record consistent[ly] with the trial court's ruling." *Carlson*, 311 Or at 214. Thus, we assume that the court found that Smith believed that he had a potential claim to any partnership interest that his statements would impair. *Id.* But here, as in *Reynoldson*, there is nothing in the record to support that finding. Smith never testified that he believed that he had a partnership interest, nor was there any evidence from which the trial court might have inferred that belief. In fact, the only evidence regarding Smith's belief was the hearsay content of the phone call itself, which the state introduced to prove that Smith *did not* believe he had a partnership interest. That same evidence cannot logically support the court's implicit finding that he *did* hold that belief. And even though defendant herself testified and produced other evidence of *her* belief that a partnership existed, the state has not identified any factual connection between that evidence and Smith's perception of the business relationship. Thus, nothing in that evidence, either, supports the factual predicate that the state must provide.

Further, as defendant pointed out at trial, most, if not all, of Smith's statements actually *protected* his pecuniary and other interests at the time that he made them. For example, in response to Jones's insinuation that some of the forged checks had been written to Smith, Smith said, "I hardly made any money [last year]. I worked my butt off." The state offered that statement to support the inference that Smith had been an employee rather than a partner. However, the statement itself advanced rather than impaired Smith's interests—if true, the statement showed that Smith had not been complicit in defendant's alleged crimes. Likewise, the statement that Smith "didn't even know she was on [the] account" exculpated rather than implicated Smith. And, to the extent that the evidence did tend to show that Smith himself was not a partner, that inference stood to benefit him as well. In other words, by disclaiming a partnership, Smith distanced himself from any financial implications, should defendant ultimately be found liable.

The fact that Smith stood more to gain than to lose from his statements prevents us from concluding that the statements were, in fact, statements against his pecuniary

or proprietary interest. Those circumstances severely undermine the rationale behind the hearsay exception for statements against interest. Even if the trial court could have found that Smith believed that he had a partnership interest and that his statement might impair that interest—a finding that, as noted, was not supported by any evidence—his statements distancing himself from defendant's conduct and placing all blame at her feet cannot reasonably be considered to be against his interest. As such, his statements lack the reliability inherent in statements truly against interest, because a reasonable person may well have made those statements for reasons other than his or her belief that the statement was true.

In summary, to the extent that the state argues that Smith's statements were against his interest as a potential partner in Jones's business, we do not agree. The only evidence at trial on that point indicated that Smith believed he did not have a partnership interest. Thus, any supposed interest that he may have been motivated to protect was "speculative and remote" and, therefore, could not warrant admission of his statements over defendant's hearsay objection. *See Reynoldson*, 275 Or at 645. As a result, the trial court erred in admitting the phone call evidence under the hearsay exception for statements against pecuniary or proprietary interest, OEC 804(3)(c).

Finally, we conclude that the trial court committed reversible error by admitting the phone call evidence. Evidentiary error is harmless if there is "little likelihood that the particular error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003); *see also* OEC 103(1) ("Evidential error is not presumed to be prejudicial.").

Here, the state offered—and the trial court admitted—the phone call evidence for the specific purpose of undermining defendant's claim that she had a partnership interest in the alleged victim's business, a claim that formed the centerpiece of her defense to the theft charges. The state bore the burden of disproving that defense beyond a reasonable doubt. ORS 161.055(1); *State v. Pranger*, 110 Or App 237, 239-40, 822 P2d 714 (1991), *rev den*, 313 Or 75 (1992) (once defendant raises defense of honest claim of right, state bears

burden of disproving defense beyond a reasonable doubt). Moreover, by admitting the entire recording on the ground that portions of it related to defendant's partnership interest, the court also erroneously allowed the jury to hear considerable evidence related only to the forgery charges. Because Smith asserted the spousal privilege at trial, he could not be cross-examined regarding his recorded statements, and those hearsay statements remained largely uncontradicted at trial. In contrast, defendant was able to impeach Jones's credibility at trial. And even though the state introduced defendant's own prior statements apologizing for her actions and arguably undermining her own defense, she flatly denied having made those statements.

Furthermore, we are not persuaded that the trial court's erroneous admission of the recording was not prejudicial in light of the admission of Eggleston's testimony regarding a few of its statements. The tape recording relayed all of Smith's firsthand statements rather than Eggleston's secondhand description of some of them. And, as noted, the 12-minute tape recording contained numerous allegations by Smith and Jones directly accusing defendant of theft and forgery. Thus, the tape recording was "qualitatively different" from Eggleston's testimony and not "merely cumulative." *See Davis*, 336 Or at 34 (looking to those factors to determine whether evidentiary error was harmless). As a result, we cannot say that there is little likelihood that the error affected the verdict. Admitting the evidence was reversible error.

Reversed and remanded.