JOINER, Judge.
This Court's opinion of March 17, 2017, is withdrawn, and the following is substituted therefor.
Larry Sheffield was convicted of murder, see § 13A-6-2, Ala. Code 1975, and was sentenced to life imprisonment. The circuit court ordered Sheffield to pay a $1,000 fine, a $1,603 crime victims compensation assessment, and court costs.
Facts and Procedural History
The State's evidence at trial tended to show that Sheffield shot and killed Jeffrey McMillian. On July 19, 2014, Kimberly Paige and Latitia Lamley were bartending and Cathy McCary and Alfred Bean of the musical duo "Al and Cathy" were performing at Trader's Bar, a nightclub in Baldwin County. Paige, Lamley, McCary, and Bean testified that McMillian, Sheffield, and Sheffield's wife, Sheila, were at Trader's that evening. Bean testified that, during a break in his performance, he sat down at the bar to speak with a friend. Bean observed Sheila sitting at the bar and McMillian standing next to her. Bean testified:
"I heard a-I would say a shouting. And I turned and it was-Mr. Sheffield was coming out of the bathroom and he-shouting. And I think-and what I say was he hit Mrs. Sheffield in the back of the head with a slap.
"....
"When I heard him shout, I turned. And he came over behind her and hit her in the back of the head (indicating) with his palm. And at that point, Mr. McMillian pushed him and said, 'What's your problem?' And Mr. Sheffield punched him back."
(R. 187.) Bean heard Sheffield tell Sheila "that she could get a ride home with him, meaning Mr. McMillian."
Hank Wilson, who went to Trader's on July 19, 2014, to see Al and Cathy perform, spoke with McMillian several times throughout the evening. At one point, he and McMillian went to the area of the bar where Sheila was sitting between two open spots. Wilson stood to Sheila's left, and McMillian stood to Sheila's right and began talking to her. Wilson then witnessed Sheffield-whom he identified in court-approach Sheila, slap her head, and pull her hair. Wilson heard Sheffield say to Sheila, "[Y]ou can fuckin' go home with him." Wilson saw Sheffield turn toward McMillian, say something that Wilson did not hear, and gesture toward McMillian with his finger before leaving Trader's.
Lamley saw Sheffield shove Sheila and say that he was ready to leave. Lamley testified:
"Jeff [McMillian] kind of sat there and talked to me for a little bit. I had just given him another beer, so he sat there and talked to me. And he couldn't believe that Mr. Sheffield punched him in the face.
"....
*40 "He kind of just kept over-thinking the situation, and then he asked me to watch his beer, he was going to go downstairs. I said, 'Well, they have already left, just let it go.' I tried to get him to stay in the bar but he just was upset with the whole situation and felt like he needed to go talk to Mr. Sheffield."
(R. 153-54.)
Gwen Falkenberry, V.J. Autrey, Mike Smith, and Terri Smith were talking in the Trader's parking lot on July 19, 2014, when they each heard a "pop" that they assumed was a firecracker. Falkenberry "didn't think anything about it at the time" but when she turned to walk to her car, she saw McMillian lying on the ground and realized that the sound she heard was actually a gunshot. Falkenberry testified, "When I saw [McMillian] laying there, I ran-I ran over and I remember yelling and saying, 'What just happened? What did you just do?' And [Sheffield] said that he shot him and not to touch him. And then I turned around and screamed at my friends." Falkenberry testified that Mike then ran over and "went off on Mr. Sheffield." Falkenberry testified:
"[Mike] was yelling at [Sheffield], 'What did you just do? Why did you do this?' And then [Mike] was-um, he was-he was hitting on [Sheffield]. He was-
"And then, um, he, Mr. Sheffield, said, 'I just used this once'-and had the gun right there. Said, 'I just used it once, I'll use it again.' "
(R. 343.) Falkenberry, Autrey, Mike, and Terri testified that they did not hear an altercation prior to hearing the gunshot and that the conditions in the parking lot were such that they would have heard an altercation had one occurred. Falkenberry identified Sheffield in court as the person who admitted to shooting McMillian.
Investigator Richard Chenoweth with the Spanish Fort Police Department responded to the shooting. A .40 caliber Glock-brand semiautomatic pistol was recovered from Sheffield; no other weapon was recovered from the scene, and McMillian appeared to have been unarmed. Investigator Chenoweth transported Sheffield to the police station and informed him of his Miranda [1] rights. Sheffield gave an audio-recorded statement, and the State played the recording for the jury. A summary of Sheffield's account of the incident follows:
Sheffield and Sheila arrived at Trader's between 9:30 and 10 pm on July 19, 2014. Throughout the evening, Sheffield observed McMillian speaking to several groups of people. Sheffield stated McMillian was "hitting on" and dancing with various women, and he believed McMillian was intoxicated. At one point, Sheffield stepped outside; when he returned, he saw McMillian "over there on top of" Sheila and assumed McMillian was drunkenly bothering her. Sheffield told McMillian to get away from his wife and said to Sheila, "Let's go, let's get out of here."
Sheffield left Trader's and was pulling his truck up to the entrance when McMillian came outside. Sheffield could not remember whether Sheila had made it to the truck, was walking down the entrance-way stairs, or had gone back inside Trader's at that time. Sheffield was outside the truck so he could help Sheila get into the truck when he realized McMillian was "hollering" that he was going to "beat my ass," but at that moment, Sheffield did not know to whom McMillian was referring. McMillian then descended the stairs, jumped on Sheffield, *41 threw him against the truck, and started beating the top of his head. McMillian knocked Sheffield's glasses off and his dentures out of his mouth, breaking them. Sheffield could not get McMillian off him, so Sheffield pulled his .40-caliber Glock from his right side and attempted to "pistol whip" McMillian. Sheffield had his finger on the trigger while he struggled to unholster the gun,[2] and he feared McMillian might try to wrestle the gun away from him. Sheffield had his hand on the handle while he swung the gun down in an attempt to get McMillian off him. During the altercation, the gun went off even though Sheffield had not intended to shoot McMillian. Sheffield initially thought he had not shot McMillian or that perhaps he had shot McMillian in the arm because McMillian "went away from" Sheffield, causing Sheffield to think McMillian had run away. McMillian twisted around and fell; McMillian did not move, and Sheffield saw blood and "couldn't believe it." Sheffield told Sheila and others to call emergency 911. A woman and a man approached, and the man pinned Sheffield to his truck and began hitting him until police arrived. Sheffield, who claimed he was in fear for his life, stated, "I thought I was acting in self-defense, ... the guy was beating the hell out of me. I'm an old man, I can't get out there and fist fight .... I didn't have no intention of shooting nobody." (State's Exhibit 84.)
Dr. Stacy Turner, a medical examiner with the Alabama Department of Forensic Sciences, testified as an expert in the field of forensic pathology. Dr. Turner, who performed the autopsy on McMillian's body on July 21, 2014, testified that McMillian died as a result of a gunshot wound to the head and that "the gun was pressed up against the skin at the time it was fired." Dr. Turner recovered a bullet fragment from McMillian during the autopsy.
In a hearing held outside the presence of the jury, the trial court considered the State's motion to introduce a recorded telephone conversation between Sheffield and Sheila under Rule 804(b)(3), Ala. R. Evid.-the statement-against-interest exception to the rule against hearsay. The State argued that because Sheila had invoked her spousal privilege, she was an unavailable witness, and, as Sheffield's wife, Sheila's statements against Sheffield's penal interest were therefore also contrary to Sheila's pecuniary and proprietary interest.[3] In response, Sheffield argued, among other things:
"We don't see how the statement that he murdered somebody is against her pecuniary or proprietary interest. I mean, he doesn't have a job. If anything, him going off to prison could be within her pecuniary and proprietary best interest. She makes statements on there about wanting to divorce him and leave him. Those would be along the lines of wanting to get rid of somebody. They're *42 certainly not against her interest to courier[sic] in her opinion."
(R. 623-24.)
The trial court allowed the State to admit the recording under Rule 804(b)(3), Ala. R. Evid., because, the court stated, Sheila was an unavailable witness, and a reasonable person would not want her spouse to be sentenced to prison. The court offered to issue an instruction with respect to Sheila's unavailability as a witness and Sheffield's lack of opportunity to cross-examine her, but Sheffield declined an instruction. The State played the recordings for the jury:
"SHEILA: Well, what caused the incident (unintelligible) then?
"SHEFFIELD: Say what?
"SHEILA: Huh? Alcohol? No. No. Not me. You were smoking a joint outside, and you, you turned your jealousy on some innocent soul, took his life, and now you're worried about your son? Okay.
"SHEFFIELD: Is he my son?
"SHEILA: Yes, he is.
"SHEFFIELD: Then what are you doing this to me for, then?
"SHEILA: I'm not going through this hell anymore, Larry. I am not going through it.
"SHEFFIELD: Ain't nobody done it to you, Sheila. All I done is ask you what's going on and you talking (unintelligible).
"SHEILA: What have you done? What have you done? You have hurt me. You have broken bones. You have killed innocent people. You have accused me of shit that I have not-
"SHEFFIELD: Sheila, the guy come down there. He come down there and jumped on me, Sheila. I was gone. I was through. I was through with him. You told me he went by me, I quit and left. That's-
"SHEILA: Larry, I know what happened. I know, I relive it every night in my dreams.
"SHEFFIELD: I do, too, Sheila.
"SHEILA: You're a guilty son of a bitch.
"SHEFFIELD: Sheila. Sheila.
"SHEILA: Guilty, guilty, guilty.
"SHEFFIELD: Sheila.
"SHEILA: I didn't cause it, you did.
"SHEFFIELD: Who says you did, Sheila?
"SHEILA: Who says I have to keep putting up with your crap? Who says I have to (unintelligible) with you anymore? Who says that? I don't have to take your fuckin' crap no more, Larry.
"SHEFFIELD: What crap are you talking about, Sheila? You (unintelligible).
"SHEILA: Your accusations. Me screwing my first cousin.
"SHEFFIELD: Sheila.
"SHEILA: I have never screwed nobody.
"SHEFFIELD: Well stop it then. (Unintelligible) talking like this.
"SHEILA: You know what-(unintelligible)-If you come home that's all I'm going hear, that's all I'm going hear (unintelligible).
"SHEFFIELD: I want you to be there when I come home. Me and you and (unintelligible).
"SHEILA: Well, I won't be. I won't be, Larry.
"SHEFFIELD: Why you gonna do that for?
"SHEILA: 'Cause you're a idiot. I don't trust you. I'm scared of you.
"....
*43 "SHEILA: You think on why you're there. You don't comprehend the fact that you're in jail for taking a innocent person's life, Larry, much less wanting to--
"SHEFFIELD: You can't talk about it on the phone, Sheila. I can't talk about that kind of stuff on the phone. I only know it was self-defense, Sheila.
"SHEILA: I know what happened, the good Lord knows what happened.
"SHEFFIELD: I do, too. It was self-defense, Sheila.
"SHEILA: No it wasn't.
"SHEFFIELD: Sheila, it was. What did, what did Knizley[4 ] say?
"SHEILA: Cold-blooded murder.
"SHEFFIELD: That ain't what Knizley said.
"SHEILA: Jealousy.
"SHEFFIELD: That ain't what Knizley said.
"SHEILA: I trust Knizley, and he said why, why did-"
(State's Exhibit 102.)
At the close of the State's evidence, Sheffield moved for a judgment of acquittal on the ground that the State failed to prove a prima facie case of murder. Specifically, Sheffield argued that the State failed to show that he intentionally caused McMillian's death because, Sheffield said, he was acting in self-defense. Moreover, he argued, there was evidence that McMillian's death was accidental. The trial court denied Sheffield's motion. At the close of the evidence, Sheffield renewed his motion for a judgment of acquittal, and the trial court again denied his motion. Sheffield was ultimately convicted of murder.
Discussion
On appeal, Sheffield raises several issues. Because we reverse Sheffield's conviction based on the trial court's error in admitting Sheila's statements into evidence, we do not address Sheffield's remaining claims.
Initially, we address the State's claim that, because Sheffield " 'expressly refuse[d] the offer of a curative instruction, any error [was] clearly invited.' Whitehead v. State, 777 So.2d 781, 829 (Ala. Crim. App. 1999)." (State's brief, p. 19.) The State argues that defense counsel's " 'refusal of the trial court's offer to give curative instructions prevents the defendant from receiving relief on appeal under certain circumstances.' Ex parte Thomas, 625 So.2d 1156, 1157-58 (Ala. 1993)." (State's brief, p. 19.) The circumstances of Sheffield's case, however, did not warrant a curative instruction from the trial court. The Supreme Court of Alabama stated in Thomas:
"[C]urative instructions are used primarily when an objection to prejudicial testimony is sustained; the instruction serves to eradicate the harmful effects of the inadmissible testimony. In such situations, the consistent actions of the trial court serve to totally nullify the effect of the testimony. Here, the overruling of the objection had the effect of communicating to the jury that the evidence was relevant and probative; any later inconsistent action by the trial court had at least the possibility of confusing the jury or reinforcing the inadmissible evidence in their minds."
625 So.2d at 1158 (emphasis in original).
Here, the trial court overruled Sheffield's objections and admitted Sheila's statements. Any instruction, therefore, would not have served to cure an error and would have been inconsistent with the trial court's earlier ruling-possibly confusing *44 the jurors and reinforcing in their minds the evidence to which Sheffield was objecting. Accordingly, we cannot say that Sheffield invited any error when he declined the trial court's offer to issue a curative instruction.
A. Admissibility of Hearsay Statements
We turn now to whether the trial court erred when it admitted Sheila's statements under Rule 804(b)(3), Ala. R. Evid. "The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000) (citing Jennings v. State, 513 So.2d 91, 95 (Ala. Crim. App. 1987) ).
Rule 804(b)(3), Ala. R. Evid., provides:
"(b) Hearsay Exceptions: The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
"....
"(3) STATEMENT AGAINST INTEREST. A statement which was at the time of its making so contrary to the declarant's pecuniary or proprietary interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."
The committee comments to Rule 804(b)(3), Ala. R. Evid., state:
"This subsection acknowledges the admissibility of a statement that was, at the time the statement was made, against the pecuniary or proprietary interest of the declarant. ...
"....
"The essence of the exception continues to be that the statement was against the interest of the declarant at the time the statement was made. In determining whether the facts satisfy the against-interest requirement, the judge considers the declarant to have the traits of a reasonable person. This is consistent with traditional Alabama law. See McCord v. State, 220 Ala. 466, 126 So. 873 (1930)."
"Proprietary statements are usually those against a property interest of the declarant. Statements against pecuniary interest are commonly those acknowledging indebtedness on the part of the declarant." C. Gamble, McElroy's Alabama Evidence, § 249.01(1)(b)(6th ed. 2009).
"Not just any statement against one's interest will qualify under [ Rule 804(b)(3), Ala. R. Evid.]. Rather, the statement must be so far against the interest of the declarant that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. As one leading commentator has observed: 'The interest involved must not be too indirect or remote.' Whether a statement is against interest constitutes a fact sensitive determination. Such facts are to be judged under a reasonable person standard.
"....
"Sometimes it will be absolutely clear that the declaration was against the declarant's pecuniary or proprietary interest. At other times, however, the question of whether the declaration is against one's pecuniary or proprietary interest is unascertainable from the declaration alone. In these latter cases the courts must look at surrounding circumstances in addition to the statement. A declarant's acknowledgment that he is a partner, for example, might be a declaration against interest if the partnership is insolvent but not if it is enjoying healthy solvency. The context of the statement *45 may be highly relevant in determining whether it was a statement for or against the declarant's interest.
"In those instances where a statement could be for as well as against the declarant's pecuniary or proprietary interest, some courts have determined the status of the statement by asking whether the primary motive of the declarant, at the time the declarant made the statement, was to aid or derogate the declarant's own self-interest. Only if the against-interest motive predominates does the statement qualify."
C. Gamble, McElroy's Alabama Evidence, § 249.01(5)(6th ed. 2009).
This issue appears to be one of first impression; we can find no Alabama caselaw that speaks directly to whether a declarant's statements made against a spouse's penal interest may also be considered contrary to the declarant's own pecuniary or proprietary interest. The Oregon Court of Appeals, however, interpreted the admissibility of hearsay statements under a similar exception-OEC[5 ] 804(3)(c)-in State v. Lyman, 107 Or. App. 390, 812 P.2d 23 (1991). OEC 804(3)(c), O.R.S. § 40.465, provides:
"The following are not excluded by ORS 40.455[6 ] if the declarant is unavailable as a witness:
"....
"(c) A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made statements unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the person accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
Lyman was charged with driving under the influence of intoxicants. Lyman's wife, Judy, asserted her marital privilege and did not testify at trial. The trial court admitted Judy's statements as having been made against her pecuniary interest. The Court of Appeals of Oregon set out the facts of the case:
"Officer Rothermund testified: He went to defendant's home to investigate a domestic disturbance at 4:05 p.m. Defendant appeared coming out of the bushes and acknowledged that he had been drinking. Ten or fifteen minutes later, Judy walked up to the house in a highly agitated state. She told the officer that she had just hidden their car[ ] so that defendant could not drive it. She said that she was tired of defendant's drinking and driving and that she had hidden the car for their own good. She explained that they had been fighting because defendant had failed to pay the rent on time. She said that she had seen the defendant driving at 3 p.m., while she was on the telephone to someone at Al-Anon, and she thought he was then intoxicated. Rothermund arrested defendant for driving under the influence. Defendant gave Judy some money before he left.
"Defendant objected to Judy's out of court statements, and the trial court stated:
*46 " 'I'm sure that Mrs. Lyman was concerned about the rent money, as shown by the testimony as counsel for the defense has argued. I'm also sure she was kind of tired of her husband's drinking and driving, as she said to the officer. And then the question is whether she really said these things, appreciating the risk that he might be taken in for drinking and driving, or driving under the influence. Or whether she just wanted to resolve the immediate problem.
" 'I think as a trier of fact, we could from these circumstances find that she was concerned with both matters. That yes she was interested in the fate of the rent money but she was now so tired of his drinking and driving that she was willing to take the risk to tell the police officer regarding what happened, what her husband was doing, and in today's society, people know that there can be serious consequences from that, and this wouldn't be the first time, I'm sure, that someone in the position of the spouse is taking the tough-love approach, even though the results may be pecuniarily adverse, not only to the offending spouse but also to the spouse, mate's statements.
" 'On that basis, all of the statements recited by the officer will be received as evidence in this case. On the hearsay exception where the declarant is unavailable-[OEC] 804(3)(c).' "
107 Or. App. at 392-93, 812 P.2d at 24. In finding that Judy's statements were not admissible under OEC 804(3)(c), the court stated:
"This is the first case to address the exception for statements against pecuniary interest as it is formulated in OEC 804(3)(c). The Legislative Commentary to the rule explains that that kind of statement is reliable because people do not say things that are damaging to their interests, unless they believe that they are true. OEC 804(3)(c) incorporates the rationale into the rule by requiring the statement to be 'so far contrary to the declarant's ... interest ... that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true.' Compare Persad v. Kaiser Foundation Hospital, Inc., 106 Or. App. 615, 809 P.2d 706 (1991).
"The trial court implicitly found that defendant's and Judy's finances were interrelated. It found that Judy appreciated the risk that her statements exposed defendant to penal sanctions and reasoned that people know that there may be serious consequences of a conviction for driving under the influence of intoxicants. The question, however, is not merely whether she appreciated the risk, but whether a reasonable person in her position would consider the risk so great that she would not tell a lie. We conclude that, under the circumstances, the risk of pecuniary loss to Judy was too attenuated to ensure that the statements were reliable.
"A reasonable person's veracity is more likely to be affected by considerations of the primary effect of statements than by consideration of indirect effects. The primary effect here was to expose defendant to penal sanctions. Judy made the statements after having a fight with her husband that was of sufficient magnitude for the police to be called. She was angry at him for failing to pay the rent and upset[ ] because she thought he intended to drive when he was intoxicated. Pecuniary loss to defendant from the penal sanctions was only a secondary effect, and pecuniary loss to Judy because of her husband's loss was *47 even further removed. The statements were not so far contrary to her pecuniary interests that a reasonable person in her position would not have said them if she believed that they were untrue."
107 Or. App. at 393-94, 812 P.2d at 25.
In a more recent decision, State v. Kaino-Smith, 277 Or. App. 516, 371 P.3d 1256 (2016), the Court of Appeals of Oregon held that a husband's statements accusing his wife of committing theft and forgery-the crimes for which she was being tried-were not admissible under OEC 804(3)(c) as statements against his pecuniary or proprietary interest. Kaino-Smith was prosecuted for stealing money from her employer, Jones. In her defense, Kaino-Smith claimed that she and her husband were Jones's business partners and, therefore, were also entitled to the company's funds. Kaino-Smith's husband, Smith, asserted his marital privilege and did not testify at trial. To counter Kaino-Smith's claim of partnership in Jones's business, the State introduced statements made during recorded telephone conversations in which "Smith and Jones repeatedly accused defendant of forging checks and stealing money, which, the state argued, indicated that neither of them believed that defendant had any right to the money that she took." 277 Or. at 520, 371 P.3d at 1259-60. The State argued that Smith's statements were admissible under OEC 804(3)(c) and indicated that it was offering the statements to rebut Kaino-Smith's defense theory that she was authorized to use the money. The Court stated:
"Before a hearsay statement may qualify as a statement against interest, there must be 'some evidence, or at least an inference which could be drawn from that evidence, which indicates that the declarant realized that the statements were against his pecuniary interest at the time they were made.' Reynoldson v. Jackson, 275 Or. 641, 645, 552 P.2d 236 (1976). That factual predicate is essential, because a statement against interest loses its reliability if the declarant did not appreciate the statement's potential detrimental impact. Kirkpatrick, Oregon Evidence § 804.04[3][a], 914.
"....
"... [Smith's] statements distancing himself from defendant's conduct and placing all blame at her feet cannot reasonably be considered to be against his interest. As such, his statements lack the reliability inherent in statements truly against interest, because a reasonable person may well have made those statements for reasons other than his or her belief that the statement was true."
Kaino-Smith, 277 Or. App. at 525-27, 371 P.3d at 1262-63.
Turning to the instant case, we question: (1) whether Sheila's primary motive at the time of making the statements against Sheffield's penal interest was to hurt or to help her own pecuniary or proprietary interest; and (2) whether the risk to Sheila's interests was so great as to make her statements inherently reliable. The State generally argued only that Sheila, as Sheffield's wife, had a "pecuniary and proprietary interest in his acquittal." Sheffield argued that Sheila would actually benefit from his possible conviction and prison sentence and referenced Sheila's intent to divorce Sheffield-which was evident from the recordings-following the trial. The trial court ruled that a reasonable person would not want her spouse to be convicted and sentenced to prison.
With respect to Sheila's motive, the record gives no indication that Sheila's statements were, at the time of their making, *48 against her pecuniary or proprietary interest.[7] We cannot say that Sheila's motive in making the statements was "so contrary to her pecuniary interests that a reasonable person in her position would not have said them if she believed that they were untrue." Lyman, 107 Or. App. at 393, 812 P.2d at 25.
With respect to the risk to Sheila's interests, the primary effect of Sheila's statements was to expose Sheffield to criminal punishment. Any pecuniary or proprietary loss to Sheffield would have been indirect, and any such loss to Sheila would have been even more remote. Therefore, we cannot say that a reasonable person in Sheila's situation would have considered the risk to her pecuniary or proprietary interest so great or so direct that she would not lie. Under the circumstances of this case, the risk of loss to Sheila was too attenuated to ensure that her statements were inherently reliable. Accordingly, the trial court abused its discretion when it admitted Sheila's statements under Rule 804(b)(3), Ala. R. Evid.
B. Harmless-Error Analysis
Rule 45, Ala. R. App. P., provides:
"No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
This Court has stated:
" ' "[B]efore the reviewing court can affirm a judgment based upon the 'harmless error' rule, that court must find conclusively that the trial court's error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant." Ex parte Crymes, 630 So.2d 125, 126 (Ala. 1993) (emphasis omitted [in Casey ] ).' "
Frye v. State, 185 So.3d 1156, 1166-67 (Ala. Crim. App. 2015) (quoting Ex parte Casey, 889 So.2d 615, 621-22 (Ala. 2004) ).
Under the facts of this case, we cannot say that the erroneous admission of Sheila's hearsay statements did not probably injuriously affect Sheffield's substantial rights. The ultimate issue at trial was whether Sheffield acted in self-defense when he shot and killed McMillian. Sheila's hearsay statements directly rebutted Sheffield's self-defense claim, indicating that Sheffield was jealous and that he had no justification for shooting McMillian. Although the State presented a strong case of guilt, we cannot say that the State's evidence of Sheffield's guilt was so overwhelming as to render harmless the improper admission of Sheila's statements accusing Sheffield of intentionally killing McMillian without proper justification. See generally Hillard v. State, 53 So.3d 165 (Ala. Crim. App. 2010).
Conclusion
Because Sheila's hearsay statements may have contributed to the jury's verdict, we conclude that the erroneous admission of those statements adversely affected *49 Sheffield's substantial rights and thus were not harmless under Rule 45, Ala. R. App. P. Accordingly, the judgment of the trial court is reversed, and this case is remanded for proceedings consistent with this opinion.
APPLICATION FOR REHEARING OVERRULED; OPINION OF MARCH 17, 2017, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
Windom, P.J., and Welch, Kellum, and Burke, JJ., concur.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Investigator Chenoweth testified that Sheffield was wearing a plastic "pancake type holster" ... "designed for a Glock-type weapon" and explained that the holster has a mechanism that requires a person "to know to push the button in and then to pull the gun out." (R. 449.) Investigator Chenoweth confirmed that Sheffield "would have had to have pushed that release button" to unholster his firearm. (R. 450.)

On application for rehearing, the State notes that, while arguing in favor of its motion, the State averred to the trial court "that the portions [of the recording] played to the trial court included the topics of 'money and mortgages and bankruptcy.'" (State's brief on application for rehearing, p. 10.) The record indicates that that particular argument to the trial court was incorrect; therefore, we do not include those facts in this opinion.

Dennis Knizley was Sheffield's trial counsel.

"OEC" is an acronym for Oregon Evidence Code.

ORS § 40.455 provides that "[h]earsay is not admissible except as provided in ORS 40.450 to 40.475 or as otherwise provided by law."

If anything, Sheila's statements that she was afraid of Sheffield and wanted to end their marriage indicate that Sheila would benefit from Sheffield's possible conviction and prison sentence. Any determination of Sheila's motive, however, would be speculative because Sheila was not available for cross-examination.