ARMSTRONG, P.J.
*498 Defendant appeals a judgment convicting him of attempted promoting prostitution (Counts 1 and 10), fourth-degree assault (Counts 2 and 8), harassment (Counts 3 and 9), second-degree assault (Count 4), unlawful use of a weapon (Count 12), coercion (Count 6), menacing (Count 13), attempted compelling prostitution (Count 11), and felon in possession of a firearm (Count 14). Defendant assigns error to the trial court's admission of printed internet pages that advertised prostitution services. In his first three assignments, he contends that the trial court erred in ruling that the advertisements were admissible under OEC 404(3)[1] to prove defendant's plan or "general prostitution enterprise," and that the trial court abused its discretion under OEC 403[2] in determining *285 that the probative value of the evidence outweighed its prejudicial effect. In his fourth assignment, he contends that the advertisements contained out-of-court statements made by declarants who did not testify at trial and, therefore, that they were admitted in violation of OEC 802[3] and Article I, section 11, of the Oregon Constitution.[4]
We conclude that the advertisements did not contain hearsay because they were verbal acts that were not offered for the truth of the matter asserted in them, and, thus, the admission of the advertisements did not violate OEC 802 or defendant's right under Article I, section 11, to confront witnesses. However, we conclude that the trial court erred in *499 admitting the advertisements as nonpropensity evidence of defendant's plan to commit the charged crimes and that the error was not harmless with respect to defendant's convictions for attempted promoting prostitution and attempted compelling prostitution. We therefore reverse and remand defendant's convictions on Counts 1, 10, and 11, and otherwise affirm.[5]
I. FACTUAL AND PROCEDURAL BACKGROUND
We summarize the testimony relevant to the trial court's decision to admit the disputed evidence, which is a ruling that we review for legal error. State v. Stapp , 266 Or. App. 625, 626, 629, 338 P.3d 772 (2014).
A. The State's Case
In April or May 2011, A was working as an adult entertainer when she met and began a sexual relationship with defendant. A was struggling financially and living in a hotel. She considered engaging in prostitution so that she could afford to rent an apartment. Defendant was living at that time with three women, Young, Wilson, and Holman.
Early in their relationship, defendant asked A to engage in an act of prostitution with Wilson and Holman, but A refused. After about two and one-half months, A and defendant's relationship became violent; on one occasion, defendant choked A after she refused to have sex with him and another woman. When defendant learned that A had had sex with a pimp, he pushed and kicked A and took money from her.
Defendant told A that, if she wanted her money back, she would have to listen to what he said, and he urged her to begin prostituting herself. A believed that defendant would leave her if she did not prostitute herself. At first, A tried to prostitute herself on the "track" along 82nd Avenue in Portland, but she was not offered enough money by prospective customers for her to agree to engage in sexual acts with them. Defendant encouraged A to keep trying, explaining that the money would add up. A became frustrated and sent a text message to defendant, "I will never again walk the track for anyone. I'm not that desperate for cash."
Defendant suggested that A place prostitution advertisements on the internet-specifically on craigslist. com and backpage.com-rather than walk the track. He took photos of A for use in the advertisements and paid for the advertisements with Young's credit card. Defendant also rented hotel rooms and gave A ecstasy to facilitate her prostitution transactions. Although A received responses to the online advertisements, she ultimately refused to have sex with any of the customers because they wanted to have unprotected sex with her. Defendant became angry and threw a chair at A, accusing her of wasting the money that he had spent on the hotel rooms.
*286 At one point, he sent a text to A, demanding that she "[put her] info back up on the post."
On October 21, 2014, A sent defendant several text messages telling him that she wanted to make him happy by putting "money in his pocket." She told him that she was "trying" and assured him that she would walk the track. When defendant ignored the text messages, A responded, "I know I'm getting brushed off, 'cause I'm not waving $800 in your face." A knew from looking at messages on defendant's phone that "the girls who are offering him money are getting a lot more responses than the girls who aren't."
Defendant asked A to place an internet advertisement for a "two-girl special." He told her that he wanted her to do the "special" with Wilson or Holman. A told defendant that she was uncomfortable with engaging in prostitution with either of them. Knowing that he would be angry with her because of her response, A sent defendant a text asking him "to wait to beat [her] ass" until after she dropped her son off at her mother's home.
At around noon the day of the exchange of text messages between defendant and A, defendant picked up A and her son at her home. Defendant was angry, and, while A was trying to put her son's car seat into defendant's car, defendant assaulted A from behind, causing an abrasion to her shoulder. When A turned around, defendant hit her in the face, cutting her lip. A got in the passenger seat and began arguing with defendant. Defendant then shot A in the left leg with a small-caliber handgun, causing her to suffer extreme pain and to vomit out of the window.
A asked defendant to drop her son off at her mother's house, which he did. Defendant then drove to his house nearby, where he gave A ecstasy and prescription painkillers. Cach, a friend of defendant's who was also a nurse's assistant, came over and bandaged A's leg wound. When Cach asked defendant what had happened, he replied, "What happens when you waste my time?"
Defendant drove A to a motel where his cousin and two other women were staying. He left A with a laptop, instructing her to take a shower and place an advertisement on backpage.com. When A failed to post the advertisement, defendant hit A in the face and stomach and then instructed her to get into his car. After she got into defendant's car, he hit her in the face a few more times. Defendant told A that she "could either stop playing around with his time and with his money and buckle down and be serious," or he could let her go and "the next time he sees [her] he's going to kill [her] with whoever [she's] with."
Defendant and A separated at around 10:00 p.m. near a local high school. Defendant told A that he was going to leave for a few hours to give her time to "think about what [she] wanted to choose to do," and told her to text him "when [she] was ready." He then threatened to kill her if she contacted the police. A locked herself in a bathroom at the school and called an acquaintance for a ride. She also sent her mother a text message telling her that defendant had shot her, after which A's mother called 9-1-1. While A waited for her friend to arrive, she sent defendant several text messages. First, she told defendant to stay away from her and her family. Then, an hour later, she sent defendant a message asking him to take her and her son to Minnesota with him, stating, "My family doesn't get it. I'm not going to square up. I will go to rehab and get some help, but I'm not a square, nor will I ever be." Defendant did not respond to those messages.
A then called the police. In a recorded 9-1-1 call, she explained that defendant had shot her and that she wanted to go to a hospital. When the police arrived, A told an officer that her boyfriend had shot her because he was upset that she had recently cheated on him and because she "did it for free" instead of making him money. A explained that she was disrespecting defendant and told the police that she had placed an advertisement on craigslist.com to "make him happy." She also said that defendant had threatened to hurt her "if she didn't obey him regarding that." At the hospital, the police questioned A again, and she repeated her story. She told a detective that she prostituted "for herself for stability," but added that she believed that *287 defendant shot her because she had cheated on him "for free," without making him any money.
The police ultimately arrested defendant and took two cellphones from him at his arrest. Defendant gave the police permission to search the content of those phones, including his contact list, call log, text messages, and photographs. The police found over 700 contacts in defendant's phones. Detective Cui began to "run" some of the phone numbers listed as contacts in defendant's phone. After running less than 25 percent of the contacts, Cui found 10 to 15 phone numbers that were connected to online prostitution advertisements. Cui conducted an internet search of defendant's phone number and found a July 23, 2011, advertisement on backpage.com for "Nina," which was a nickname for Wilson. Cui also found photographs in defendant's cellphone that were similar to the photographs in the July 23, 2011, advertisement, as well as a text message that said, "Hi Nina." Cui showed the advertisement to A, who identified the woman in the photographs as Wilson. Cui found two additional advertisements featuring Wilson and Holman dated September 13, 2011, and November 9, 2011. Those advertisements were not directly connected to defendant by his phone number, and they were placed at a time that defendant was not having phone contact with either Holman or Wilson. The police subsequently recovered a .25-caliber bullet that was embedded in a door of defendant's car.
B. Defendant's Case
Young, the mother of one of defendant's children and defendant's best friend, testified that she was unaware that defendant was involved in prostitution activities. She testified that, in the summer of 2011, she lived with defendant and a number of other individuals, including her and defendant's son, defendant's girlfriend (Holman), and her friends (Wilson and Red). During that time, the cellphone that police had linked to the online advertisements was not used exclusively by defendant but operated as the house phone. Young testified that she had thrown her son out of the house in the summer of 2011 because she believed that he was engaging in prostitution activities with Holman. After defendant was arrested, Young had frequent phone contact with defendant while he was in jail. Those calls were recorded and, on cross examination, the state introduced them into evidence. In one of the calls, defendant told Young that he "never received a wooden nickel" from A.
Defendant testified that, when he met A, she was living in a dirty hotel with her son. He began a sexual relationship with her and often helped her care for her son, which gradually led defendant to feel concern for A's son. Defendant believed that, after his affections for A began to wane, A tried to use her son as "a hook" to get him to spend time with her, and that she would offer him money to assist her with her son. Defendant denied that he had encouraged A to place prostitution advertisements on the internet and testified that A's text messages to him on October 21 had nothing to do with prostitution. When confronted with his text message to A stating, "Put your info back on the post," defendant stated that the message was about A soliciting clients for the Golden Dragon strip club, which was having trouble attracting patrons because it served juice and not alcohol.
Defendant denied assaulting and shooting A on October 21 and stated that he did not own or carry a gun; he said that the gun belonged to A. Defendant testified that, while she was in the car with him, A began complaining that her toes were cold and that her leg was "getting worse." He claimed that he did not know how she had been injured, but he could see that she had an injury to her calf. According to defendant, A said that she did not want to go to the doctor, so he called Cach and asked for her help in tending to A's wound.
Defendant explained that he had two phones because one of the phones had a cracked screen and barely functioned; he also testified that one of the phones was considered to be a house phone and was used by other members of the household. Defendant denied being involved in any prostitution-related activities and stated that he never used his phone to post internet prostitution advertisements. He testified that he was unaware *288 that Holman and Wilson had been posting such advertisements while they were living with him.
C. Defendant's Motion To Exclude Evidence
Defendant moved before trial to exclude all of the evidence obtained through Cui's inspection of defendant's phone records, including sixteen online advertisements offering prostitution services. One of the advertisements contained defendant's cellphone number and photographs of Wilson that were similar to photographs found on defendant's cellphone; two of the other advertisements contained photographs of Wilson and Holman; and the remainder of the advertisements contained phone numbers that were listed in defendant's contact list on his cellphone. Defendant argued that none of the advertisements was admissible under OEC 404(3) because none was relevant for any nonpropensity purpose. Alternatively, he argued that, to the extent that any of the evidence was admissible under OEC 404(3), it should be excluded because its probative value was substantially outweighed by the danger of unfair prejudice. Defendant argued further that the advertisements contained inadmissible hearsay and that their admission would violate his constitutional right to confront witnesses.
In response, the state argued that all of the other-acts evidence that defendant sought to exclude was relevant to show defendant's plan or common scheme in promoting prostitution. The state explained that a detective would testify "that prostitution and human trafficking is not a crime that occurs in a singular nature. It's an ongoing pattern-type crime." Thus, the state argued, the advertisements were relevant as "direct evidence of a plan or a scheme of an ongoing human trafficking enterprise." The state also argued that the advertisements were direct evidence that defendant was attempting to promote A as a prostitute, because some of the advertisements involved Wilson and Holman, the women with whom defendant had asked A to engage in acts of prostitution.[6]
The trial court admitted the evidence, adopting the state's argument that it was relevant to defendant's plan or common scheme. The court also concluded that the evidence was admissible under OEC 403 because the probative value of the evidence outweighed the danger of unfair prejudice. The court did not specifically address defendant's hearsay and confrontation arguments.
II. ANALYSIS
A. Hearsay and Confrontation[7]
Defendant challenges the trial court's admission of the online prostitution advertisements, renewing his argument that the advertisements contained inadmissible hearsay statements of non-testifying witnesses and that their admission as evidence violated his right under Article I, section 11, to confront witnesses. We review the trial court's ruling on those issues for legal error. See State v. Kaino-Smith , 277 Or. App. 516, 523, 371 P.3d 1256 (2016) (reviewing OEC 802 determination for legal error); State v. Simmons , 241 Or. App. 439, 455, 250 P.3d 431 (2011) (reviewing Article I, section 11, claim for legal error).
Before we discuss the merits of defendant's argument, we pause to address the state's preservation argument and conclude that defendant's hearsay and confrontation claims are adequately preserved for appellate review. The state contends that defendant's objections were perfunctory and did not alert the trial court to his argument *289 on appeal. We disagree. Before trial, defendant expressed concern about the admission of the online prostitution advertisements, stating "I'm concerned if we're talking about these * * * Backpage.com ads, [be]cause again we get into a hearsay and a confrontation problem. These women are not coming in as witnesses. We have no ability to cross-examine them." Then, when the state offered the first of the advertisements as evidence at trial, defendant objected, citing "relevance, confrontation issues and the fact that the document itself is hearsay." After the state offered the remainder of the advertisements into evidence, defendant objected, again citing his confrontation right as a basis for his objection.
Defendant's objections, coupled with his pretrial assertions, were sufficient to provide the trial court with an explanation of his objections that the online advertisements contained inadmissible hearsay and that their admission would violate his constitutional right to confrontation. See State v. Martinez , 275 Or. App. 451, 459-60, 364 P.3d 743 (2015), rev. den. , 358 Or. 611, 369 P.3d 386 (2016) (the defendant's "global, categorical objections" to a handful of exhibits were sufficient to put the state and trial court on notice of his hearsay and confrontation arguments); State v. Walker , 350 Or. 540, 550, 258 P.3d 1228 (2011) ("Particularly in criminal cases, in which there is a premium on considerations of cost and speed, the realities of trial practice may be such that fairly abbreviated short-hand references suffice to put all on notice about the nature of a party's arguments.").
Having determined that defendant's hearsay and confrontation arguments are preserved, we turn to the merits of the arguments. The right to confrontation under Article I, section 11, "work[s] to limit the introduction of hearsay testimony. Whether the admission of [a witness's] testimony offends defendant's rights to confront witnesses depends, in the first instance, on whether it is hearsay evidence." State v. Ruggles , 214 Or. App. 612, 619, 167 P.3d 471, adh'd to as modified on recons , 217 Or. App. 384, 175 P.3d 502 (2007), rev. den. , 344 Or. 280, 180 P.3d 702 (2008).
OEC 801(3) defines hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." "Some statements are themselves evidence of significant legal facts; the substantive law attaches certain consequences to such utterances so that the mere making of the statement becomes an issue in the case." East County Recycling v. Pneumatic Construction , 214 Or. App. 573, 579, 167 P.3d 464 (2007) (citing Hickey v. Settlemier , 318 Or. 196, 204, 864 P.2d 372 (1993) ). "Such out-of-court statements are not offered for the truth of what they state and, under longstanding common-law principles, are not hearsay." Id . We conclude that the online webpages were not offered for the truth of the matter asserted in them but, rather, were offered to show that the advertisements themselves were acts of prostitution.
Defendant was charged with two counts of attempted promoting prostitution and one count of attempted compelling prostitution. A person is guilty of promoting prostitution when the person "[i]nduces or causes a person to engage in prostitution" or engages in conduct that "institutes, aids or facilitates an act or enterprise of prostitution." ORS 167.012(1)(b), (d). A person is guilty of compelling prostitution when the person knowingly "[u]ses force or intimidation to compel another to engage in prostitution or attempted prostitution." ORS 167.017(1)(a). Thus, an act of prostitution can serve as direct evidence of an element of both crimes. ORS 167.007 defines prostitution as when a "person engages in, or offers or agrees to engage in , sexual conduct or sexual contact in return for a fee." (Emphasis added.)
The online advertisements at issue in this case constituted acts of prostitution-they were offers to engage in sexual conduct in return for a fee. See State v. Harris , 242 Or. App. 438, 441, 256 P.3d 156, rev. den. , 351 Or. 254, 264 P.3d 1285 (2011) (noting that ORS 167.007 criminalizes an offer or agreement to engage in sexual conduct for a fee without requiring that there be any further action to carry out the offer or *290 agreement). Thus, the act of posting an online advertisement offering sexual conduct for money, itself, carries legal significance, regardless of whether the statements contained in the advertisement are true. In any event, the advertisements in this case were not offered to prove the truth of the statements in them but, rather, to demonstrate that defendant was connected to offers of prostitution. Therefore, the advertisements are verbal acts and not hearsay. See Hickey , 318 Or. at 204, 864 P.2d 372.
Defendant argues that the advertisements in this case are similar to the statements that we held in State v. Causey , 265 Or. App. 151, 333 P.3d 345 (2014), were inadmissible hearsay. In Causey , the defendant was convicted of attempting to promote prostitution. At trial, the state presented evidence of text messages that had been recovered from the defendant's cellphone. An investigating officer testified that the text messages indicated that the defendant had a pimp/prostitute relationship with a woman, Foster. Id . at 152-54, 333 P.3d 345. On appeal, the defendant argued that the text messages were inadmissible hearsay. The state contended that the messages were not hearsay because they were not offered to prove the truth of the matter asserted but were offered to prove that the defendant knew of Foster's prostitution activities and was personally involved with them. Id . at 154, 333 P.3d 345. We rejected the state's argument, explaining:
"Although the text messages may have indicated that defendant had knowledge of Foster's activities, in order for him to have that knowledge, the content of those text messages had to be true. Although the state did not need to prove that Foster was at a particular time and place charging a man $500 for her services, the state did need to prove that Foster was meeting a man for sex in exchange for money. The text messages are relevant because they are circumstantial evidence of an 'act or enterprise of prostitution' required under ORS 167.012(1)(d). For the text messages to be relevant as circumstantial evidence, however, the jury was required to accept the truthfulness of the content of those messages. The relevance was not that the statements were made, but the content of the statements."
Id . at 154-55, 333 P.3d 345.
Unlike the advertisements in this case, the statements at issue in Causey were text messages describing acts of prostitution, and the act of sending the text messages carried no independent legal significance. Thus, the statements in Causey were not verbal acts, and they constituted inadmissible hearsay. As explained above, that is not the case here.
Because we conclude that the statements in the online advertisements were not hearsay, their admission violated neither OEC 802 nor defendant's confrontation right under Article I, section 11. See, e.g. , Ruggles , 214 Or. App. at 619, 167 P.3d 471.
B. OEC 404(3) and OEC 403
Defendant also renews his argument that the trial court erred in admitting the advertisements under OEC 404(3) as evidence that was relevant for the nonpropensity purpose of demonstrating defendant's plan to promote or compel prostitution, and that the evidence was unduly prejudicial and should have been excluded under OEC 403. The state contends that the trial court did not err in admitting the evidence, but the state has abandoned on appeal the argument that it made at trial that the advertisements were relevant to prove defendant's plan. Instead, the state argues, for the first time on appeal, that the evidence was relevant to show defendant's intent. That is, the state asserts that "the advertisements were relevant [to] support the state's theory that defendant acted with intent to promote prostitution when he demanded that [A] post online advertisements." The state argues that the advertisements "also allowed the state to rebut the defendant's theory that his demands had an innocent explanation." In a supplemental brief, the state argues that, even if the advertisements were not relevant for a nonpropensity purpose under OEC 404(3), they were nevertheless relevant as propensity evidence under OEC 404(4).
OEC 404(3) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in *291 order to show that the person acted in conformity therewith." However, other-acts evidence may be admissible for other purposes, including to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Supreme Court has explained that OEC 404(4)"supersedes the first sentence of OEC 404(3)" by making other-acts evidence admissible to prove a defendant's character. State v. Baughman , 361 Or. 386, 404, 393 P.3d 1132 (2017).[8] However, OEC 404(4) does not supersede the second sentence of OEC 404(3). Thus, when evidence is offered for a nonpropensity purpose, as it was in this case, we analyze the admissibility of that evidence under the second sentence of OEC 404(3). Id.
"We review a trial court's ruling admitting evidence of other acts as relevant to a nonpropensity purpose contemplated by OEC 404(3) for errors of law, and in light of the record that was before the court at the time it made its decision." State v. Jones , 285 Or. App. 680, 682, 398 P.3d 376 (2017) (internal citations omitted). As noted, the state offered the online advertisements under OEC 404(3) on the theory that they were relevant to prove defendant's plan to promote or compel prostitution, and the trial court ultimately admitted the evidence under that theory.
In State v. Turnidge (S059155) , 359 Or. 364, 374 P.3d 853 (2016), cert. den. , --- U.S. ----, 137 S. Ct. 665, 196 L.Ed.2d 554 (2017), the Supreme Court considered whether evidence adduced by the state in that case was relevant under OEC 404(3) to prove the defendant's plan. In doing so, the court distinguished between "true plan" evidence and "spurious plan" evidence. Id . at 439, 374 P.3d 853. True-plan evidence can consist of other-acts evidence demonstrating that a defendant, in fact, formed a plan and committed the other acts as steps in the execution of the plan. In that circumstance, the other-acts evidence "need not be similar to the charged crime." Id . at 440, 374 P.3d 853. Spurious-plan evidence, on the other hand, is evidence that is offered to show that a defendant "engaged in a pattern or systematic course of conduct from which the existence of a plan is to be inferred." Id . at 439, 374 P.3d 853 (emphasis omitted). To establish that a defendant acted pursuant to a spurious plan and, hence, that evidence relevant to that plan is admissible, the state must show that "there was a high degree of similarity between defendant's prior conduct and the charged conduct." Jones , 285 Or. App. at 690, 398 P.3d 376 (citing Turnidge , 359 Or. at 438-40, 374 P.3d 853 ).
The state has not argued on appeal that the online advertisements were relevant to establish a true plan, and we are not persuaded that they are.[9] As noted, the state offered into evidence sixteen online prostitution advertisements, virtually all of which were connected to defendant only because they contained phone numbers found in defendant's contact list. The record does not support a conclusion that those advertisements constituted steps in the execution of a true plan by defendant to promote or compel A into performing acts of prostitution.
We also are not persuaded that the advertisements were relevant to establish a spurious plan to promote or compel prostitution. The state failed to demonstrate a high degree of similarity between the online advertisements involving Wilson, Holman, and other women and defendant's commands to A to place internet prostitution advertisements. To the extent that the online advertisements were connected to defendant, the state adduced no evidence that defendant had ordered or forced any of the women to post the advertisements. There was not even evidence to suggest that defendant had asked or en couraged *292 the women to post online prostitution advertisements. The advertisements themselves were not sufficient to show that defendant had a spurious plan to command women to engage in acts of prostitution, in the same way that he allegedly commanded A to do that. At most, they demonstrated that defendant associated with women who engaged in online acts of prostitution. Thus, the trial court erred in admitting the advertisements for the nonpropensity purpose of demonstrating defendant's plan.
The state offers two alternative theories of admissibility on appeal-first, that the advertisements were relevant to prove intent and, second, that they were relevant as propensity evidence under OEC 404(4). However, the state has failed to fully develop an argument as to why we should consider either of those alternative theories under the "right for the wrong reason" principle, and, thus, we decline to do so. See Outdoor Media Dimensions Inc. v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001) ; see also Jones , 285 Or. App. at 690-91, 398 P.3d 376 (declining to address alternative basis for admissibility of evidence under OEC 404(4) under similar circumstances); State v. Kolb , 251 Or. App. 303, 312, 283 P.3d 423 (2012) (declining to consider alternative basis for affirmance that would require court to decide, "without legal record development or any real assistance from the parties," "difficult, nuanced, and systematically significant issues").
C. Harmless Error
Although the trial court erred in admitting the online prostitution advertisements under OEC 404(3), that determination does not end our analysis. The harmless-error doctrine requires us to affirm a defendant's conviction, notwithstanding the trial court's error, if there was "little likelihood" that the error affected the jury's verdict. State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003). "To determine whether a trial court's error was harmless, we examine the record as a whole and consider the error and the context in which it occurred." State v. Durando , 262 Or. App. 299, 305, 323 P.3d 985, adh'd to as modified on recons , 264 Or. App. 289, 331 P.3d 1095, rev. den. , 356 Or. 400, 339 P.3d 440 (2014).
"The erroneous exclusion or admission of evidence is harmless 'if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict,' Davis , 336 Or. at 32, 77 P.3d 1111 ***, or if the jury 'would have regarded the *** evidence as duplicative or unhelpful to its deliberations,' id ., at 33, 77 P.3d 1111 ***."
Id .
Viewing the record as a whole, we conclude that the trial court's error in admitting the online prostitution advertisements was harmless with respect to defendant's convictions for second-degree assault, fourth-degree assault, menacing, harassment, coercion, unlawful use of a weapon, and felon in possession of a firearm. The online prostitution advertisements did not relate to central factual issues or necessary elements of those offenses, and we conclude that there is little likelihood that their admission affected the jury's verdict. See State v. Richards , 263 Or. App. 280, 283, 328 P.3d 710 (2014) ("[I]f the particular issue to which the error pertains has little relationship to the issues being determined by the trier of fact, then there is less likelihood that the error affected the verdict."). However, in light of the conflicting testimony between A and defendant regarding the nature of their relationship and defendant's involvement in A's prostitution activities, the advertisements were likely to have affected the jury's verdict with respect to defendant's convictions for attempted promoting prostitution and attempted compelling prostitution. Accordingly, we reverse and remand with respect to those counts.
Convictions on Counts 1, 10, and 11 reversed and remanded; remanded for resentencing; otherwise affirmed.

OEC 404(3) provides:
"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

OEC 403 provides:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

OEC 802 provides that "[h]earsay is not admissible except as provided in ORS 40.450 to 40.475 or as otherwise provided by law."

Article I, section 11, provides that, "[i]n all criminal prosecutions, the accused shall have the right *** to meet the witnesses face to face[.]"

We reject without written discussion defendant's remaining assignments of error, which challenge the denial of his motions for judgment of acquittal on Counts 2 and 8, as well as the sufficiency of the evidence supporting his conviction on Count 12 and the assignments of error raised in defendant's pro se supplemental brief.

ORS 167.012 provides that a person is guilty of promoting prostitution either by inducing or causing a person to engage in prostitution, ORS 167.012(1) (b), or by engaging in conduct that "institutes, aids or facilitates an act or enterprise of prostitution," ORS 167.012(1)(d). Here, defendant was indicted under both of those theories.

Although we reverse and remand defendant's convictions on Counts 1, 10, and 11 on the basis that the trial court erred in admitting the challenged evidence under OEC 404(3) as proof of plan, 291 Or. App. at ----, 422 P.3d 282, we nevertheless address defendant's hearsay and confrontation arguments because they are likely to arise on remand. See, e.g. , State v. Deloretto , 221 Or. App. 309, 189 P.3d 1243 (2008), rev. den. , 346 Or. 66, 204 P.3d 96 (2009) (addressing assignments of error that are likely to arise on remand despite reversing on different ground).

The Supreme Court has raised but not resolved the question whether "the federal constitution may, as a matter of law, prohibit the admission of other acts evidence to prove propensity in a criminal case in which the defendant is charged with crimes other than child sex abuse." Baughman , 361 Or. at 403 n. 8, 393 P.3d 1132 (citing State v. Williams , 357 Or. 1, 17, 346 P.3d 455 (2015) ). We need not resolve that question in this case.

Because this case was tried before the Supreme Court decided Turnidge , the state did not specify in its argument to the trial court whether it contended that the evidence was relevant as true-plan evidence or as spurious-plan evidence.