Submitted October 28, 2014, affirmed December 9, 2015, petition for review denied February 18, 2016 (358 Or 611)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MARTIN RIOS MARTINEZ,
*Defendant-Appellant.*

Malheur County Circuit Court
12024356C2; A152946

364 P3d 743

Peter Gartlan, Chief Defender, and Eric Johansen, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Rolf C. Moan, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

Defendant was convicted of unlawful manufacture of methamphetamine, ORS 475.886; unlawful possession of methamphetamine, ORS 475.894; two counts of unlawful delivery of methamphetamine, ORS 475.890; three counts of being a felon in possession of a firearm, ORS 166.270; and two counts of endangering the welfare of a minor, ORS 163.575. On appeal, in six assignments of error, defendant argues that the trial court erred in admitting into evidence two cell phones and numerous text messages, which the state offered to show defendant's drug activity.[1] We affirm.

Sergeant Speelman arranged for two confidential informants to make several controlled purchases of methamphetamine. At the direction of the police, one of the informants contacted Emerson, an acquaintance who had previously bought methamphetamine for the informants, to arrange a purchase from defendant. On January 12, 2012, the informant drove with Emerson to defendant's home, gave Emerson money, and waited in the car while Emerson went inside to complete the transaction. Emerson returned with a small baggie of methamphetamine. One month later, on February 13, Emerson and both informants returned to defendant's home to make a second purchase. The informants provided Emerson with cash and remained in the car while Emerson again purchased methamphetamine at defendant's home.

Based on those transactions, police obtained a search warrant for defendant's property. A search revealed, among

---

[1] Defendant also contends that the trial court's error violated his rights under the confrontation clauses of the federal and state constitutions, and that his trial was rendered fundamentally unfair in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. However, on appeal, defendant fails to develop any confrontation argument that he raised below. Similarly, although defendant made fleeting references at trial to the Fourteenth Amendment, he failed to develop that claim in order to preserve it for review. Because defendant does not ask us to review for plain error, we decline to address those constitutional claims. *See Cunningham v. Thompson*, 188 Or App 289, 297 n 2, 71 P3d 110 (2003), *rev den*, 337 Or 327 (2004) ("Ordinarily, the appellate courts of this state will decline to address an undeveloped argument."); *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000) ("Generally, an issue not preserved in the trial court will not be considered on appeal.").

other things, stolen goods, brass knuckles, a surveillance system, packaging materials, scales, several firearms, ammunition, written transaction records, marijuana, and a large quantity of methamphetamine. Police also seized two cell phones—one belonging to defendant and another belonging to his girlfriend, Ibarra. A subsequent search of the two cell phones revealed hundreds of text messages and emails, some of which, the state contended, linked defendant to drug transactions.

Defendant waived his right to a jury trial. During its opening statement, the state referred to the text messages found on defendant's cell phone, arguing that they would "tie it all together to show that [defendant] was really the king maker, the controller, the person who controlled the [drug] deals." Defendant promptly objected:

"[A]s far as any of the text messages from anybody I will make it now, and I certainly don't want to interrupt the court or the witness at every go, but if the Judge would let me to just say I'd put it on the record now that any and all text messages from other persons on any and all cell phones they violate—they are hearsay for one and should be inadmissible. And they violate the confrontation clause, the Sixth and Fourteenth Amendments of the United States Constitution and then Article 1, section 11, of the Oregon Constitution.

"These are out of court statements made by other persons. If they're not here to testify Judge, you know, it violates confrontation, and they're certainly hearsay, and therefore they should not be admissible."

The state responded that the received messages that defendant stored on his phone were admissible as "adoptive admissions" under OEC 801(4)(b)(B) (exempting from the hearsay rule a statement that is offered against a party and is "[a] statement of which the party has manifested the party's adoption or belief in its truth"). The trial court noted defendant's objection and announced that it would make evidentiary rulings on the text messages as they were offered.

The state questioned Emerson about the January 12 purchase of methamphetamine at defendant's home. Emerson

testified that, although she could not remember who specifically sold her methamphetamine that day, she likely would have "texted [defendant] to get it." Defendant preemptively objected to the introduction of any text message evidence on that subject:

"[DEFENSE COUNSEL]:   Judge, objection on the text message as a hearsay statement and it's not admissible.

"THE COURT:   It's her statement so it's not hearsay. She's the one that made the text.

"[DEFENSE COUNSEL]:   Well, Your Honor, on hearsay statements, her prior statement, if it's going to be offered in the state's case, it has to be offered by—if the party opponent admission it would be offered by me. Her out of court statement is hearsay and is not admissible.

"THE COURT:   Well, but she—she's saying she can't remember, it's a written record of the date. I'm going to allow it."

The prosecutor also questioned Emerson regarding the February 13 purchase. Emerson testified that defendant was not home that day and that another person at defendant's residence conducted the transaction. Emerson could not remember whether she had mistakenly told the informants that she had bought the methamphetamine directly from defendant on that date. To aid Emerson's memory, the prosecutor directed her attention to three specific text messages that she had sent to defendant on February 14 and 16. Those messages read as follows:

"[Feb. 14]   U thank u could get ur homeboy to do me right like the first the sec. Was fucked up i got a lot of taxs. but bunk blah blah blah . So ?

"[Feb. 14]   Hey i got a electric stove oven works great n a refrigator both a couple years old if u still need i will let it go 4 50

"[Feb. 16]   Can i stop by 4 50[.]"

Defendant objected to Emerson's text messages and offered a "continuing objection" to "any and all text messages." After the court noted the objection, the state offered Emerson's text messages into evidence as Exhibit 41. Defendant objected

once more, arguing that Emerson's text messages did not fall under any exception to the hearsay rule:

"[DEFENSE COUNSEL]: And just continued objection, Judge. They're hearsay and they're not being offered by a party opponent.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: So they're inadmissible.

"THE COURT: All right.

"[DEFENSE COUNSEL]: And she testified there was no response from my client.

"THE COURT: Well, and that—they are what they are then. She also testified she couldn't remember, and these are written records that she's consulted so I'll allow them for that purpose."

Thus, the trial court allowed the state to introduce copies of the three text messages sent by Emerson as Exhibit 41. In doing so, the trial court appeared indirectly to refer to OEC 612 (allowing the use of a writing to refresh a witness's memory) and OEC 803(5) (allowing the use of a recorded past recollection).

Speelman testified regarding the evidence found during the search of defendant's property. When the state inquired about the text messages discovered on the two cell phones, including an exchange between defendant and Ibarra, defendant objected once again that "any and all text messages coming to [defendant]" were inadmissible hearsay. In response, the state renewed its argument that incoming text messages on defendant's cell phone—and, particularly the messages sent to defendant by Ibarra in the context of that specific conversation—were admissible as "adoptive admissions" under OEC 801(4)(b)(B). The trial court, declining to take a categorical approach, explained:

"Okay, well, I think that I have to look at what they are, because anybody could send anybody a text message that they immediately delete, and it doesn't mean that they're adopting that. On the other hand when they have a conversation back and forth with somebody then I think they clearly have, so those are the two extremes. And there may

be things in the middle where for example somebody is in the contacts, they're having regular contact with them and you know, so that, again that may be in the middle.

"So I guess what we're going to have to do, I'll give you a standing objection to any text messages, and then I guess we'll have to look at them one by one."

As to the particular text message conversation between defendant and Ibarra, the court concluded that it "clearly [fell] within the rule" on adoptive admissions. The court noted that defendant was "responding to [the text messages sent by Ibarra], * * * not disavowing them in any way," and participating "very actively" in the conversation. The trial court then admitted the conversation between defendant and Ibarra as Exhibit 51.[2]

During his trial testimony, defendant denied being home during either of the two controlled purchases. As to the January 12 transaction, defendant testified that Ibarra had sent him a text message indicating that Emerson stopped by wanting to get "some stuff" and that he told Ibarra to tell Emerson that he was not home. With respect to the February 13 purchase, defendant testified that he was in Nevada with Ibarra on February 12-14, and that, although Emerson sent him text messages while he was away, he never answered them. The state then questioned defendant about numerous text messages and emails found on his cell phone from individuals asking to "come by" to get "some

---

[2] Exhibit 51 consists of 13 messages sent by defendant and 17 messages sent by Ibarra. In his appellate brief, defendant contends that all 30 text messages are inadmissible, but specifically identifies only eight messages that are "pertinent to the charges." Those messages are:

"[IBARRA]: The stuff u hve ovr here isnt any good, jst thaught to let u knw

"[DEFENDANT]: How u nwo did u try it i got it over here

"[IBARRA]: Marissa jst cme for 40 and yeah I through sum in the piece to c if it wz gud or not and itz not so im pretty sure she'll be bck

"[DEFENDANT]: Really your doin it

"[IBARRA]: I told u itz not good an I told u dnt fukn tripp bcz IM NOT PREGNANT

"[DEFENDANT]: Your fucking lieing

"[IBARRA]: I told u im not and dnt act like u care even If I was..bcz if u did u wouldnt be an asshole and stay in ur damn shop all the damn time

"[DEFENDANT]: "Babe[.]"

stuff" during the three days that defendant was in Nevada. Defendant denied having received those messages, explaining that he had limited cell service during his trip. Defendant also testified that Ibarra "had [his phone] the whole time" and that he did not answer any incoming messages. At that point, the state offered into evidence all of the text messages that were received on defendant's cell phone during his trip to Nevada. Defendant again raised his standing objection, and the following colloquy ensued:

"THE COURT:   Why are you offering them?

"[PROSECUTOR]:   Well, Your Honor, it shows over and over these folks calling or texting him, hey can I come by. Can I come by. Can I come by for the 30. Can I come by for a 50. Are you home. * * * It goes to show that [defendant] was in control of that house at all times. * * * People didn't go over there to do anything without his approval. I think that's the point, and that's the reason I'm offering them. We could go through them line by line.

"[DEFENSE COUNSEL]:   Well, Judge, I think the testimony from my client has said that these incidents while they're in [Nevada] deal with, you know, [Ibarra's] response not my client's, so.

"* * * * *

"THE COURT:   So * * * [defendant is] saying he didn't get any messages [or] wasn't responding. So I assume you're impeaching him on that, because you wanted to show me obviously somebody responded? And he says [he] was out of service, and you're offering them to show that he—even though he wasn't home he was controlling whether people could go over there and what went on at the home?

"[PROSECUTOR]:   Correct.

"THE COURT:   Okay, I'm going to allow them over [defendant's] objection for that purpose."

The court then admitted approximately 200 incoming text messages on defendant's phone as Exhibit 54.

Over defendant's continuing objection, the trial court also admitted the two cell phones themselves as Exhibit 33 (defendant's) and Exhibit 37 (Ibarra's). Defendant was convicted at the conclusion of his bench trial.

On appeal, defendant contends that the trial court erred in admitting Exhibits 41, 51, and 54, comprising "literally hundreds of erroneous[] *** hearsay statements" in the form of incoming text messages on defendant's cell phone.[3] Defendant also argues that the cell phones themselves should not have been admitted. The state responds that, by objecting to each exhibit "as a whole"—instead of by identifying specific, objectionable text messages—defendant failed to preserve his claims of error for appeal. Alternatively, the state advances a number of arguments as to why the text messages in each exhibit are not hearsay, and, therefore, were properly admitted. Finally, the state argues that any error in admitting the text message evidence was harmless in light of the other, more incriminating evidence against defendant.

When reviewing a trial court's evidentiary ruling as to whether a statement falls within an exception to the hearsay rule, we apply a two-part standard of review. *State v. Cook*, 340 Or 530, 537, 135 P3d 260 (2006). We will "uphold the trial court's preliminary factual determinations if any evidence in the record supports them," but we review "the trial court's ultimate legal conclusion, as to whether the hearsay statement is admissible under an exception to the hearsay rule," for legal error. *Id.*

We begin with the state's preservation argument, which, as we later explain, is also inextricably linked to the merits of this case. Generally, claims of error that were not raised before the trial court will not be considered on appeal due to the strong policies favoring preservation. *State v. Walker*, 350 Or 540, 548, 258 P3d 1228 (2011). The preservation rule ensures procedural fairness to opposing parties by requiring that "'the positions of the parties are presented clearly to the initial tribunal'" so that "'parties are not taken by surprise, misled, or denied opportunities to meet an argument.'" *Id.* (quoting *Davis v. O'Brien*, 320 Or 729, 737, 891 P2d 1307 (1995)). Preservation also promotes judicial

---

[3] Defendant also challenges the admission of Exhibit 35, also comprising a series of text messages. The record is unclear as to whether Exhibit 35 was actually admitted into evidence. Assuming that it was, Exhibit 35 is substantially redundant of one or more of the other challenged exhibits. Thus, we need not address it separately.

economy by "giv[ing] a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal." *Peeples v. Lampert,* 345 Or 209, 219, 191 P3d 637 (2008). Lastly, preservation promotes full development of the record, which "aids the trial court in making a decision and the appellate court in reviewing it." *Id.* at 219-20. In close cases, the decision as to whether a claim is preserved for appeal will "inevitably * * * turn on whether, given the particular record of a case, * * * the policies underlying the rule have been sufficiently served." *State v. Parkins,* 346 Or 333, 341, 211 P3d 262 (2009).

What exactly is required of a party to preserve a claim for review can vary depending on the nature of the claim or argument. *Peeples,* 345 Or at 220. Ordinarily, a party must provide the trial court with "an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *Wyatt,* 331 Or at 343. However, in other cases—such as those in which the record establishes that preservation would have been futile—the preservation requirement gives way entirely. *State v. Olmstead,* 310 Or 455, 461, 800 P2d 277 (1990) ("When the trial court excludes an entire class of evidence by declaring, in advance, that it is inadmissible as a matter of law, the ruling renders a further offer futile."). Similarly, the preservation rule does not require a party to continue making an argument that the trial court has already rejected. *State v. Barajas,* 247 Or App 247, 251, 268 P3d 732 (2011); *Walker,* 350 Or at 550 ("Once a court has ruled, a party is generally not obligated to renew his or her contentions in order to preserve them for the purposes of appeal."). Ultimately, the focus of our preservation inquiry is on "whether a party has given opponents and the trial court enough information to be able to understand the contention and to fairly respond to it." *Id.* at 552.

The preservation analysis can be challenging in circumstances such as these, where the state offered a handful of exhibits, each containing multiple communications, to which defendant responded with global, categorical objections. The state asserts, in effect, that in order to preserve

his arguments for appellate review, defendant was required to make more particularized objections to the messages within each exhibit as it was introduced. Under the circumstances of this case, we disagree. Throughout trial, defendant repeatedly objected to the introduction of text message evidence against him. He did so even when it became apparent that further objections would likely be futile. And, although defendant's objections at trial lacked particularity, the general basis of his objection (hearsay) was consistently made clear. Neither the state's trial counsel nor the trial court would be surprised by the arguments that defendant is making on appeal. Accordingly, we conclude that defendant adequately preserved his claims for review.

The state's argument that defendant should have made more particularized objections, however, also bears on the merits of defendant's evidentiary challenge. That is, as the state correctly points out, defendant's failure at trial to distinguish "clearly admissible" text messages from others within the same exhibit may present a problem for defendant under *State v. Brown*, 310 Or 347, 800 P2d 259 (1990), where the Supreme Court explained that,

"'[w]hen evidence is offered as a whole and an objection is made to the evidence as a whole and is overruled, the trial court will ordinarily not be reversed on appeal if any portion of the offered evidence was properly admissible, despite the fact that other portions would not have been admissible had proper objections been made to such portions of the offered evidence.'"

*Id.* at 359 (quoting *Sproul v. Fossi*, 274 Or 749, 755, 548 P2d 970 (1976)). Thus, for example, where a defendant makes a general objection to the trial court's admission of an entire 9-1-1 recording without differentiating between admissible and objectionable statements, and where a portion of the recording is admissible, the defendant's challenge will fail. *See State v. Garcia*, 206 Or App 745, 750, 138 P3d 927 (2006) ("[I]f any one of [the victim's] statements contained on the tape recording satisfies a hearsay exception, we will uphold the trial court's ruling on the admissibility of the tape recording."); *State v. Hasson*, 153 Or App 527, 531, 958 P2d 183 (1998). The same rule applies to exhibits. *See Brown v. J.C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984).

Consequently, if any one of the text messages contained in each of the state's exhibits was properly admitted, we must affirm the trial court's ruling on the admissibility of that entire exhibit.

We first consider Exhibit 51 (the text message conversation between defendant and Ibarra), which the trial court allowed under the "adoptive admission" rule set out in OEC 801(4)(b)(B). Again, that rule provides that a statement made by another person is not hearsay if the statement is offered against a party who has manifested an adoption of the statement or a belief in its truth. In *State v. Carlson*, 311 Or 201, 808 P2d 1002 (1991), the leading Oregon case on adoptive admissions, the Supreme Court explained as follows:

> "A party *adopts* the proffered statement of another person when that party's words or conduct indicate that [he or she] intended to adopt the statement. A party manifests a *belief* in the truth of another's statement when the party intends to embrace the truth of the statement, *i.e.*, intends to agree with or approve the contents of the statement. * * * A mere listening presence does not indicate that a party has manifested an adoption of or a belief in the truth of another person's statement."

*Id.* at 207 (citations and internal quotation marks omitted; emphases and brackets in original). The Supreme Court noted that "[m]anifestation of an adoption or belief in the truth of a hearsay statement of another may occur 'expressly, impliedly, by conduct or, in a civil case, by silence.'" *Id.* (quoting *State v. Severson*, 298 Or 652, 657, 696 P2d 521 (1985)).

In *Carlson*, the Supreme Court considered whether OEC 801(4)(b)(B) applies to nonverbal conduct. In that case, police questioned the defendant about visible needle marks on his arms. 311 Or at 203. The defendant answered that the marks were injuries that he had received while working on a car. In response, the defendant's wife yelled, "You liar, you got them from shooting up in the bedroom with all your stupid friends." *Id.* The defendant simply "hung his head and shook his head back and forth." *Id.* The Supreme Court concluded that that nonverbal act was too ambiguous

to support a finding that the defendant intended to adopt or agree with his wife's statement. *Id.* at 214.[4]

As to silence, rather than a nonverbal act, in *State v. Clark*, 217 Or App 475, 175 P3d 1006, *rev den*, 344 Or 670 (2008), we concluded that a defendant's silence in response to an accusatory statement made by the victim to her friend was insufficient to support a finding that the defendant had adopted that statement. *Id.* at 484 ("The totality of the circumstances in this case do not establish that defendant's silence was anything more than a 'mere listening presence.'" (Citations omitted.)). The fact that the defendant was a bystander—rather than an active participant in that conversation—figured significantly into our analysis. *Id.* at 485 (interpreting FRE 801(d)(2)(B), the federal analog to OEC 801(4)(b)(B), and concluding that "no federal court, as far as our research has been able to discover, has held that a defendant adopted a statement made in the defendant's presence where the defendant was not an *active participant in the conversation*" (emphasis in original)).

In this case, defendant contends that, under *Clark* and *Carlson*, his failure to disavow the messages he received from Ibarra is the "functional equivalent of silence," and, therefore, cannot be considered adoption, agreement with, or approval of her messages. Defendant's arguments fail because unlike the defendants in *Clark* and *Carlson*, he was an active participant in the text message conversation with Ibarra. In response to Ibarra's first text message in Exhibit 51 ("The stuff u hve ovr here isnt any good, jst thaught to let u knw"), defendant answered, "How u nwo did u try it i got it over here." At the very least, that response was an implied manifestation of defendant's belief in the truth of Ibarra's statement that defendant had "stuff" where Ibarra was. Similarly, Ibarra's second text message ("Marissa jst cme for 40 and yeah I through sum in the piece to c if it wz gud

---

[4] The Supreme Court ultimately affirmed the defendant's convictions on the basis that his wife's statement was admissible as an excited utterance. *Carlson*, 311 Or at 219 ("In stating his objection to the trial court, defendant did not segregate inadmissible portions of [the officer's] testimony about defendant's nonverbal reaction from [the wife's] accusatory statement. An objection to evidence as a whole is insufficient as a basis for reversal on appeal when any part of the evidence objected to is admissible.").

or not and itz not so im pretty sure she'll be bck") is followed by defendant's second response ("Really your doin it"), which communicates his belief in, and commentary on, Ibarra's prior statement. Thus, the trial court did not err when it concluded that defendant had adopted the statements made by Ibarra in the text messages in Exhibit 51. And, because at least one text message in Exhibit 51 qualified as an adoptive admission, we affirm the trial court's ruling on the admissibility of that exhibit. *See Brown*, 310 Or at 358-59; *Carlson*, 311 Or at 219 ("An objection to evidence as a whole is insufficient as a basis for reversal on appeal when any part of the evidence objected to is admissible.").

Defendant also challenges the admission of Exhibit 41, containing three text messages from Emerson to defendant.[5] Although the trial court did not expressly identify the rule under which that evidence was admissible, the court explained that it allowed the messages in because Emerson "[could not] remember" whether she told the informants that she had purchased drugs directly from defendant on February 13, and because the messages were "a written record of th[at] date." We infer that the court admitted Emerson's messages pursuant to either OEC 612 (allowing the use of a writing to refresh a witness's memory) or OEC 803(5) (allowing the use of a recorded past recollection). The evidence, however, is not admissible under either rule.

In relevant part, OEC 612 provides, that,

"[i]f a witness uses a writing to refresh memory for the purpose of testifying, * * * an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce into evidence those portions which relate to the testimony of the witness."

Notably, the proponent of the writing may not introduce it into evidence. *State v. Sutton*, 253 Or 24, 26, 450 P2d 748

---

[5] As previously noted, the text messages in Exhibit 41 read as follows:

"[Feb. 14] U thank u could get ur homeboy to do me right like the first the sec. Was fucked up i got a lot of taxs. but bunk blah blah blah . So ?

"[Feb. 14] Hey i got a electric stove oven works great n a refrigator both a couple years old if u still need i will let it go 4 50

"[Feb. 16] Can i stop by 4 50[.]"

(1969), *overruled on other grounds by Elam v. Soares*, 282
Or 93, 577 P2d 1336 (1978) ("The use of a writing to refresh
present recollection does not make it admissible in evidence.
The witness's independent recollection is the evidence—not
the writing which aided in refreshing that recollection."
(Citations omitted.)). Under OEC 612, the *adverse* party is
entitled to have portions of that writing admitted. It follows
that the state, as the proponent of Emerson's text messages,
was not entitled to have them introduced into evidence over
defendant's objection. Consequently, Emerson's text mes-
sages were not properly admitted under OEC 612.

Nor were Emerson's text messages admissible under
OEC 803(5), which creates an exception to the general hear-
say rule for

> "[a] memorandum or record concerning a matter about
> which a witness once had knowledge but now has insuffi-
> cient recollection to enable the witness to testify fully and
> accurately, shown to have been made or adopted by the
> witness when the matter was fresh in the memory of the
> witness and to reflect that knowledge correctly. *If admitted,
> the memorandum or record may be read into evidence but
> may not itself be received as an exhibit unless offered by an
> adverse party.*"

OEC 803(5) (emphasis added). Even if one assumes that
the definitions of "memorandum" and "record" encompass
Emerson's text messages in this context, those messages
were admissible as an exhibit under OEC 803(5) only if
"offered by an adverse party." The state offered the evi-
dence, and defendant, the adverse party, objected. Thus, nei-
ther OEC 612 nor OEC 803(5) provided a basis for the trial
court's admission of Emerson's text messages.

On appeal, the state does not attempt to defend the
trial court's rationale for admitting Emerson's messages.
Rather, the state argues that those messages are not hear-
say because they are not "statements" or "assertions" and
they were not offered for the truth of the matter asserted.
Because the state's nonhearsay argument was made for the
first time on appeal, the state urges us to affirm the trial
court's evidentiary ruling under the "right for the wrong

reason" principle set out in *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001).[6]

The state also argues that, even if the admission of Emerson's text messages was error, that error was harmless. An error is harmless if there is "little likelihood that the particular error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Moreover, evidentiary errors are not presumed to be prejudicial unless a substantial right of a party is shown to be affected. OEC 103(1). An appellate court is required to "affirm a judgment, despite any error committed at trial, if, after considering all the matters submitted, the court is of the opinion that the judgment 'was such as should have been rendered in the case.'" *Davis*, 336 Or at 28 (quoting Or Const, Art VII (Amended), § 3). The focus of our analysis is on the "possible influence of the error on the verdict rendered" and not "whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling." *Id.* at 32. In determining the possible influence of erroneously admitted evidence on the verdict, among other considerations, we look to "whether the evidence in question was cumulative of, or 'qualitatively different' than, other admissible evidence." *State v. Haugen*, 274 Or App 127, 159, 360 P3d 560 (2015) (quoting *Davis*, 336 Or at 34).

Because we agree with the state that the error in admitting Emerson's three text messages was harmless, we need not address the state's alternative rationale for affirmance under *Outdoor Media*. As an initial matter, we note that Emerson's text messages in Exhibit 41 are relevant only with respect to the counts of unlawful delivery and manufacture of methamphetamine.[7] That said, Emerson's first

---

[6] The "right for the wrong reason" principle allows an appellate court to affirm a trial court ruling, even if the legal reasoning on which the ruling is based is erroneous, if several conditions are met. *See State v. Heater*, 271 Or App 538, 543-44, 351 P3d 776 (2015) (under *Outdoor Media*, consideration of an alternative basis for affirmance is appropriate if "(1) the evidentiary record is sufficient to support it, (2) the trial court's ruling is consistent with the view of the evidence under the alternative basis, and (3) the record is materially the same as the one that would have developed had the prevailing party raised the alternative basis below").

[7] Although defendant argues that "the text messages prejudiced him with respect to all counts," he offers no specific arguments as to how Emerson's text

two messages ("U thank u could get ur homeboy to do me right like the first the sec. Was fucked up i got a lot of taxs. but bunk blah blah blah . So ?" and "Hey i got a electric stove oven works great n a refrigator both a couple years old if u still need i will let it go 4 50") are cryptic; neither message obviously links defendant to illicit drug activity. The third message ("Can i stop by 4 50"), is inculpatory, as it suggests that Emerson wished to stop by defendant's home to obtain a particular quantity of something. That message, however, is consistent only with the state's general theory at trial that defendant was a drug dealer who sold methamphetamine. The state presented extensive evidence to that effect in the form of testimony from Emerson and several police officers who orchestrated the controlled buys of methamphetamine, as well as evidence seized pursuant to the search warrant executed on defendant's property. Moreover, that text message was sent on February 16, rather than on January 12 or February 13—the dates of the controlled buys. Because both counts of unlawful delivery of methamphetamine were predicated on the purchases of methamphetamine conducted on *those* dates, the admission of Emerson's *later* text message to defendant had little likelihood of affecting the trial court's assessment of defendant's guilt with respect to the delivery charges.

We similarly conclude that Emerson's text message was inconsequential to the trial court's ruling on the single count of unlawful manufacture of methamphetamine. That conclusion is consistent with the trial court's explanation that the judgment on the manufacturing charges was based on the discovery of various packaging materials and large quantities of methamphetamine during the execution of the search warrant on defendant's property. In any case, Emerson's text message was, at most, cumulative of other admissible evidence of a similar nature—*i.e.*, text messages from individuals asking to stop by for a particular quantity of something. As such, any error in admitting that message into evidence was harmless.

---

messages prejudiced him with respect to the remaining counts (*i.e.*, unlawful possession of methamphetamine, ORS 475.894; being a felon in possession of a firearm, ORS 166.270; and endangering the welfare of a minor, ORS 163.575).

Defendant also assigns error to the trial court's admission of Exhibit 54. That exhibit consists of approximately 200 incoming text messages on defendant's cell phone, some of which were received during defendant's trip to Nevada. Again, the record is unclear as to the purpose for which the trial court admitted that evidence. On appeal, however, defendant fails to develop argument as to why the admission of those messages was error. We also note that Exhibit 54 contains duplicates of several text messages that we have concluded were admissible as adoptive admissions in Exhibit 51. Because Exhibit 54 contains at least some admissible evidence, we will not reverse the trial court's evidentiary ruling as to the entire exhibit. *Brown*, 310 Or at 358-59; *State v. Collins*, 256 Or App 332, 347, 300 P3d 238 (2013) ("When a party objects to evidence as a whole and the trial court rules that the evidence is admissible, the reviewing court will affirm the trial court's ruling when any part of the evidence is admissible.").

Lastly, defendant contends that the trial court erred in admitting into evidence the two cell phones—one belonging to defendant (Exhibit 33) and one to Ibarra (Exhibit 37). Aside from a fleeting reference to the fact that the evidence at issue in this appeal derived from those phones, defendant fails to develop argument as to why their admission was error. Consequently, we decline to address defendant's claims to that effect. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 701 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself.").

Affirmed.