IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75947-7-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| FREDERICK KENNETH HILL, III, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 17, 2018 |

SCHINDLER, J. — An out-of-court statement is not hearsay if "the party has manifested an adoption or belief in its truth." ER 801(d)(2)(ii). A jury convicted Frederick Kenneth Hill III of domestic violence burglary in the first degree, unlawful imprisonment, and assault in the fourth degree of F.V.-L. Hill seeks reversal, arguing the court erred in admitting text messages as adoptive admissions. Because his response to the text messages does not manifest an adoption or belief in the truth of the accusatory statements, insufficient facts supported admission of the text message exchange. We also conclude the court erred in failing to instruct the jury on whether it could consider the text messages as adoptive admissions. However, because admission of the text messages did not within reasonable probabilities materially affect the outcome of the trial, we affirm the jury convictions. We deny the request to strike

the victim penalty assessment or the DNA[1] collection fee, and affirm the judgment and sentence.

## FACTS

Frederick Kenneth Hill III and F.V.-L. were involved in an on-again-off-again romantic relationship. On July 14, 2014, F.V.-L. called 911 to report Hill assaulted her.

On August 6, 2015, the State filed an information charging Hill with domestic violence burglary in the first degree and unlawful imprisonment of F.V.-L. on July 14, 2014. Hill pleaded not guilty. On March 16, 2016, the State filed an amended information that also charges Hill with domestic violence felony harassment and assault in the fourth degree of F.V.-L. Hill pleaded not guilty.

The State filed a pretrial motion to admit a transcript of a text message exchange F.V.-L. initiated with Hill on April 1, 2015. During the text message exchange, F.V.-L. makes accusatory statements.

The prosecutor argued the text messages were admissible as adopted admissions under ER 801(d)(2)(ii). The prosecutor conceded Hill did not respond directly to the accusatory statements but asserted Hill adopted the statements by silence. The prosecutor argued under the circumstances, the court should conclude Hill would have responded if the accusatory statements were not true.

> Your Honor, as the court well knows, there's this idea in hearsay case law where you can adopt a statement by your silence. And so, what we have here are text messages by the complaining witness to Mr. Hill saying, "The last time we hung out, you pulled my hair and I wet my pants," which is basically what the allegations are in this case. And, Mr. Hill responds to that by not even responding to the allegation. He says something like, "Oh, we should be an adult about this," and etcetera, etcetera. And he never responds to the allegations. So, the question is, there's basically a two-part test. Did the person actually hear the statement in question,

---

[1] Deoxyribonucleic acid.

2

understood it, and was able to respond? And was the statement made under such circumstances that you would expect the person to reasonably deny the allegation if the allegation were untrue? . . . He responds immediately. . . . And instead of denying it, he just changes the subject. And this is under circumstances where you would expect a person to actually deny it because they're having an argument in this exchange of text messages and the defendant is accusing her of different things and denying doing certain things. So, if he were going to deny it, you would expect him to deny assaulting her at this time and he doesn't.

Defense counsel argued the text messages were inadmissible out-of-court hearsay statements, not adoptive admissions, because Hill responded but did not acquiesce or manifest a belief in the truth of the accusatory statements.

I am a bit bewildered by the State's recitation just now. Mr. Hill in fact does respond and says, "Let's be adults." That's his response. . . . He doesn't have to acquiesce to her level and directly respond to her allegations. So, to say that he's silent as to her comments about him pulling her hair and making her pee on herself is completely ludicrous. . . . He has no obligation to directly respond to that, and his response is "Let's be adults about this." He does respond. He has no obligation under case law, under any law, to directly point by point respond to her, and the response he does make is completely appropriate by saying, "Let's be adults about this." The statement does not fall under any exception to the hearsay rule. It's a prior out-of-court statement. It's wholly inconsistent to prior statements she has made to the police about what happened at the time of this incident. She makes this text to Mr. Hill about a year after the incident, which is completely different from what she said to the police at the time of the incident in a written statement. And it's her attempt and the State's attempt to recharacterize the nature of this incident. That's all it is. But in any event, it does not fall under any exception to the hearsay rule, it's an out-of-court statement. Mr. Hill did not acquiesce or in any way accede to her comments by remaining silent. . . . The statement is hearsay and should not be allowed in.

The court reserved ruling on the motion to admit the text messages as adoptive admissions pending the pretrial hearing on authentication of the text messages.

F.V.-L. testified at the pretrial hearing. F.V.-L. identified the April 1, 2015 text message exchange, her cell phone number, and Hill's cell phone number. F.V.-L. said

3

she sent the first text message to Hill at around 10:49 p.m. and he responded "right away." F.V.-L. testified that Hill "always told me to act like an adult."

The prosecutor argued that under State v. Neslund, 50 Wn. App. 531, 749 P.2d 725 (1988), Hill adopted the accusatory statements by silence because he had the opportunity to deny the statements. "[G]iven his silence in the face of these allegations, it is an adoption by silence and it is not hearsay."

The defense attorney argued that unlike in Neslund, Hill responded and did not manifest adoption or acquiescence in the accusatory statements.

> Even [F.V.-L.], when she testified that, "Mr. Hill always tells me to be an adult." That was a pretty salient statement by her. "That's how he always responds to me," and that's what he responded in the text messages when he said to her, you know, "Last time we spoke, you pulled my hair and I peed on myself." The standard response to me is, you know, "We agreed to be adults." She said he always says that to her. It's not silence, it's not acquiesce, it's just the way he communicates with her. . . . That's how they communicate. . . . She initiated the contact with Mr. Hill. Mr. Hill, in his typical way, as she put it, said, "Be an adult about it." And they went on to talk about his affairs with women, which is what she really initiated the conversation to be about, and then they went from there. She never returned to the topic about the hair pulling or anything like that to draw him back in. So, again, it's not a situation where she's making accusations and he just completely ignores it over and over again. She throws the opening salvo, he responds with his typical response, and then they go from their conversations in their typical fashion to talking about his past affairs. There's nothing in those text messages to suggest that he was admitting to pulling her hair or acquiescing to her claim that he indeed had pulled her hair. He was just resorting to his typical language, which she admitted as how he communicates with her.

Defense counsel also pointed out the difference in communicating by text message:

> And again, as I indicated in my brief, this is communication by text. This is not two people having a conversation with each other in person, which may be completely different from how we communicate by text. It's much more truncated, it's much more succinct. People don't have a full open conversation.

4

Defense counsel argued the court should "find that there was no adoption by silence or acquiescence and deny the admission of the text messages. One, because they're hearsay, and two, that it doesn't meet the threshold of an adoptive admission." The court ruled the text messages were admissible as adoptive admissions.

King County Sheriff Sergeant Randall Potter, F.V.-L., and her son J.V. testified at trial on behalf of the State. The court admitted a number of exhibits into evidence, including photographs of F.V.-L.'s injuries and a transcript of the April 1, 2015 text message exchange.

F.V.-L. testified that a couple months after she and Hill began dating in 2006, they argued about whether to drive " 'to downtown Seattle.' " When F.V.-L. told Hill she did not want to go downtown, Hill

> pulled the car to the side and he's like, "Bitch, don't play with me. We're gonna go." And then he grabbed his hand and put it on my neck. And I was — he said, "We're gonna go." And so, then he started the car back again and he took me to downtown.

F.V.-L. said Hill apologized the next day. F.V-L. "didn't see him for a couple of months." But after Hill brought her "flowers and cards" and said he would " 'never do it again,' " they got back together.

F.V.-L. testified that one night in 2008, Hill called from "some bar really drunk" and said he needed a ride home. After F.V.-L. picked him up, Hill insisted on going home with her. When F.V.-L. told him no, Hill "started screaming at me, telling me, 'Bitch, you're gonna take me to your house. If you're my woman, you're gonna take me to your house.' " F.V.-L. stopped at a parking lot. F.V.-L. testified that "when we were sitting in the car, he grabbed me by my hair and was pulling my hair towards the

steering wheel a couple of times." F.V.-L. said she told him, " 'I don't want to be with you. I think you're crazy.' " According to F.V.-L., Hill said, " 'Bitch, you're gonna be with me if you like it or not, and you're gonna take me to your house.' " F.V.-L. "got out of the car" and called 911. The State charged Hill with malicious mischief and assault in the fourth degree. F.V.-L. did not testify. A jury found Hill not guilty.

F.V.-L. testified that after 2008, she "didn't see" Hill again until 2014. In 2014, F.V.-L. lived in her house in Federal Way with her teenage son J.V. F.V.-L. said Hill "would come and put flowers on my porch and cards" and told her he was " 'changing [his] life.' " F.V.-L. and Hill got back together. Hill spent the night at her house at least "two or three times a week." F.V.-L. testified Hill did not have a key and "would always call . . . before coming to the house."

On Sunday, July 13, F.V.-L. and Hill spent the night together. The next morning, F.V.-L. wished him a happy birthday before she left to go to work. F.V.-L. planned to take Hill out to dinner that night to celebrate his 47th birthday. Later that day, Hill called F.V.-L. at work to tell her he was with his daughter and the mother of his daughter celebrating his birthday. F.V.-L. was "annoyed." F.V.-L. told Hill she "didn't really want him around me if he's been drinking."

J.V. called F.V.-L. at work to tell her he planned to stay overnight with his father. F.V.-L. told J.V. she planned to visit her aunt after work then take her dog for a walk. F.V.-L. asked J.V. to " 'make sure you lock' " up the house.

F.V.-L. said the front door was locked when she arrived home after work at around 4:00 p.m. F.V.-L. got the dog and locked the front door. After she visited her aunt, F.V.-L. took the dog for a walk at Alki and left her cell phone in the car. When

F.V.-L. returned to her car, she saw that Hill "kept calling" her and leaving voicemails on her cell phone. F.V.-L. testified Hill "was just like, 'Where you at? I'm here outside your house. . . .' You know, 'Why would you do this to me on my birthday' "? F.V.-L. decided to wait until the next day to call him back.

F.V.-L. returned home between 8:30 and 9:00 p.m. F.V.-L. testified that when she unlocked the front door, she saw Hill standing behind the door. F.V.-L. asked, " 'What are you doing here? How did you get in' "? Because Hill "looked really angry," F.V.-L. said she turned to run "towards the front yard." F.V.-L. testified Hill "grabbed me by my shoulder and by my hair, and then he took me inside the house, and then he just threw me on the hallway . . . and sat me in the middle of the hallway on the steps."

F.V.-L. testified that Hill "kept threatening me. He was like telling me that, 'Bitch, don't play with my emotions. You know that I'm crazy.' " F.V.-L. said that "at one point," Hill "wanted to spit on my face. He told me like he wanted to spit so bad at my face, and he had his fist on my nose. He was pressing hard. . . . And then he kept telling me that he wanted to knock my teeth out." F.V.-L. said, "I was just so scared . . . I peed on myself."

F.V.-L. testified that over the course of the next three hours, when she tried to get up, Hill would "grab my hair and throw me against the floor." F.V.-L. said eventually she was able to calm Hill down by telling him, " 'We'll talk about this tomorrow. . . . Let's just go to sleep. . . . Go upstairs, take a shower, and then we'll talk about it tomorrow.' " As soon as Hill got in the shower, she grabbed her dog, her cell phone, and the key to her car and left. F.V.-L. drove to a nearby Lowe's parking lot and called 911.

7

The next day, F.V.-L. noticed "hand or fingerprints on the side of the wall with oil" below one of the windows in the dining room. She also noticed "the screen was missing" and found it outside "below the window." F.V.-L. said she had bruises on her wrist, arm, and thigh.

F.V.-L. obtained a no-contact order against Hill on Thursday on July 17. A victim advocate took photographs of F.V.-L.'s bruises. The court admitted the photographs into evidence.

F.V.-L. testified that Hill "kept calling" after July 14, 2014 to tell her he was " 'sorry.' " F.V.-L. told Hill, " 'You're gonna pay for this and I'm gonna press charges for what you did.' "

F.V.-L. identified the transcript of the text messages she sent Hill from her cell phone on April 1, 2015. The court admitted a transcript of the text messages between F.V.-L. and Hill into evidence as an exhibit, "Exhibit 19."

Sergeant Potter testified that he responded to the 911 call at 11:30 p.m. and arrived at the Lowe's parking lot at approximately 12:20 a.m. Sergeant Potter said F.V.-L. was "upset" but "calm." Sergeant Potter testified there were tears in F.V.-L.'s eyes and a "little bit of dry blood around the corner of her lip." Sergeant Potter asked F.V.-L. where she was injured. F.V.-L. told Sergeant Potter her neck, back, and her head hurt from "hair being pulled." Sergeant Potter testified F.V.-L. never told him she had urinated on herself while with Hill.

Sergeant Potter took photographs of F.V.-L. Sergeant Potter used a diagram to identify the injuries F.V.-L. reported. The court admitted the photographs and the "Domestic Violence Supplemental Form" into evidence. Sergeant Potter testified F.V.-L.

gave a statement under penalty of perjury and reviewed and initialed the Domestic Violence Supplemental Form identifying the injuries she reported.

J.V. testified that Hill was at the house "in the morning" on July 14. J.V. said he planned to spend that night with his father. Before he left, J.V. "ma[de] sure every single window and every single door in the house was locked, secured."

J.V. testified that when he saw F.V.-L. the next day, she had bruises on her arm and wrist and her voice was "raspy." J.V. noticed the metal frame of the window was "scuffed up," the screen was "[o]n the floor . . . outside," the window "ledges were dirty from the inside especially," and there were "fingermarks" from "dirty hands, like grease."

The jury found Hill guilty of burglary in the first degree, unlawful imprisonment, and assault in the fourth degree. The jury found Hill not guilty of felony harassment. By special verdict, the jury found the aggravating factor of domestic violence for the crimes of burglary, unlawful imprisonment, and assault.

## ANALYSIS

### Adoptive Admissions

Hill seeks reversal and a new trial. Hill contends the court erred in admitting the April 1, 2015 hearsay text messages as adoptive admissions under ER 801(d)(2)(ii).[2]

We review a trial court's decision on the admission of evidence for abuse of discretion. State v. Dobbs, 180 Wn.2d 1, 10, 320 P.3d 705 (2014). A court abuses its discretion if the decision is manifestly unreasonable or based on untenable grounds or reasons. State v. Dixon, 159 Wn.2d 65, 75-76, 147 P.3d 991 (2006); State v. Brown,

---

[2] For the first time on appeal, Hill also contends the court abused its discretion by admitting the text messages under ER 403. We do not review evidentiary objections raised for the first time on appeal. State v. Powell, 166 Wn.2d 73, 82-83, 206 P.3d 321 (2009).

132 Wn.2d 529, 572, 940 P.2d 546 (1997). A decision is based on untenable grounds if the court relies on an incorrect legal standard or does not correctly apply the law. Dixon, 159 Wn.2d at 76.

Hearsay is an out-of-court statement of the declarant offered to prove the truth of the matter asserted. ER 801(c). Hearsay is not admissible except as otherwise provided by the rules of evidence. ER 802. Under ER 801(d)(2)(ii), "Admission by Party-Opponent," an out-of-court "statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth." Adoptive admissions are, by their very nature, attributed to the other party, "even though couched in the words of a third person." Neslund, 50 Wn. App. at 554.

A party can manifest adoption of a statement by words or gestures. Neslund, 50 Wn. App. at 550. A party can also manifest adoption of a statement by complete silence or acquiescence. Neslund, 50 Wn. App. at 550-51; United States v. Moore, 522 F.2d 1068, 1075 (9th Cir. 1975).

Because of the inherently equivocal nature of silence, "such evidence must be received with caution." Neslund, 50 Wn. App. at 551. Silence constitutes an adoptive admission only if (1) the party-opponent heard the accusatory statement or incriminating statement, (2) the party-opponent was able to respond, and (3) the circumstances were such that it is reasonable to conclude the party-opponent "would have responded had there been no intention to acquiesce." Neslund, 50 Wn. App. at 551. Acquiescence makes the incriminating statement admissible against the defendant. Neslund, 50 Wn. App. at 554. "The circumstances must also be such that 'an innocent defendant would

normally be induced to respond.' " <u>Neslund</u>, 50 Wn. App. at 551 (quoting <u>United States v. Sears</u>, 663 F.2d 896, 904 (9th Cir.1981)).

Under <u>Neslund</u>, the trial court must make a preliminary determination that "there are sufficient foundational facts from which the jury reasonably could conclude that the defendant actually heard, understood, and acquiesced in the statement." <u>Neslund</u>, 50 Wn. App. at 551 (citing <u>Moore</u>, 522 F.2d at 1076). The threshold determination that the proponent has presented sufficient facts is "a matter of conditional relevance." <u>Neslund</u>, 50 Wn. App. at 551-52. "[T]he jury is primarily responsible for determining 'whether in the light of all the surrounding facts, the defendant actually heard, understood, and acquiesced in the statement.' " <u>Neslund</u>, 50 Wn. App. at 551 (quoting <u>Moore</u>, 522 F.2d at 1075).[3]

Although the jury makes the ultimate decision, "the trial judge must exercise a preliminary measure of control." <u>Moore</u>, 522 F.2d at 1076. The trial court should not submit a proffered adoptive admission by silence to the jury unless there are sufficient facts to conclude the party heard, understood, and "did accede to the accusatory statement." <u>Moore</u>, 522 F.2d at 1076.

> To submit a proffered admission by silence to the jury when there is insufficient foundational evidence to support reasonable inferences that the accused heard, understood, and acquiesced in the accusatory statement would expose the jurors to testimony that they legally could not consider but that might seem, nevertheless, to be extremely prejudicial to the defendant.

<u>Moore</u>, 522 F.2d at 1076.

---

[3] Hill argues we should hold that a party can never adopt an out-of-court statement under ER 801(d)(2)(ii) by silence. In the alternative, Hill argues the trial court, not the jury, should determine the admissibility of alleged adoptive admissions. We adhere to the decision in <u>Neslund</u>.

The court must instruct the jury that it can consider accusatory or incriminating statements as adoptive admissions only if the jury first finds that the circumstances establish the party heard, understood, and acceded to the statement. Moore, 522 F.2d at 1075-76; Neslund, 50 Wn. App. at 551-52.

On April 1, 2015, approximately four months before the State filed charges against Hill on August 6, 2015, F.V.-L. sent a text message to Hill. F.V.-L. and Hill engaged in the following text message exchange:

| | |
|---|---|
| [F.V.-L.] | Listen to that song |
| [Hill] | We do need to talk and I will listen to that song |
| [F.V.-L.] | No we don't Kenny[4] |
| [Hill] | When u wanted to talk u listen its your turn!!!! |
| [F.V.-L.] | I don't want . . . to . . . I've heard enough lies, we're cool |
| [Hill] | So the only one [t]hat can express them self is u? |

. . . .

| | |
|---|---|
| [F.V.-L.] | Yes, last time I saw you . . . you pulled my hair for 3 hours and explained how you felt and I was not able to say anything but pee on myself, so yeah |
| [Hill] | U said lets be adults so lets do that |
| [F.V.-L.] | I am an adult, I don't beat people up or call them to let them know how someone fucks |
| [Hill] | Just talk mess and instangate [sic] |
| [F.V.-L.] | Ok good bye |
| [Hill] | Why do u act like that thats not adult |
| [F.V.-L.] | I'm an adult making good choices, dealing w[i]th you and you women mess is definitely not [a] good choice |

. . . .

| | |
|---|---|
| [Hill] | Treat me as u want to be treated |
| [F.V.-L.]: | Meaning you must like people to cheat on you, bully you and lay hands on you . . . now makes sense |
| [Hill] | No I wanted someone that wouldnt give up on me |
| [F.V.-L.] | Omg ok |
| [F.V.-L.] | Yeah I shouldn't have given up on you cheating, calling other women and being emotionally and physically abused, oh yeah what idiot would give up on that? |
| [Hill] | For once u need to think a little more in depth to yourself of what was going on? |
| [Hill] | If u knew how much I love u. |

---

[4] F.V.-L. called Hill "Kenny," a shortened version of his middle name "Kenneth."

Hill challenges the trial court's decision to allow the State to introduce the text messages into evidence. The court found, "[T]he defendant was mentally, physically, and able to respond. The shortness between the short period of time between the actual message and the response suggest that the defendant was able to and actually did respond." The court concluded, "I think that this is accusatory, incriminating, and under ordinary circumstances, it would be denied, contradicted, or objected to by words, gesture, or silence." The court ruled, "It is reasonable under the circumstances to conclude that [Hill] under ordinary circumstances, or a reasonable person, would challenge those kinds of accusations."

Hill contends that because he did not acquiesce or accede in the accusatory statements made by F.V.-L. in the text messages, there are insufficient foundational facts from which the jury reasonably could conclude he acquiesced in the truth of the statements. The State asserts that as in Neslund, the circumstances support the trial court's decision to admit the text messages as adoptive admissions.

In Neslund, the jury convicted Ruth Neslund of murder in the first degree of her spouse Rolf Neslund. Neslund, 50 Wn. App. at 534-35. Neslund's brother Paul Meyers testified that while Neslund and their brother Robert Meyers were together, he heard Robert describe in "graphic" detail butchering Rolf with an ax, burning his body in a barrel, and disposing of the ashes behind the barn. Neslund, 50 Wn. App. at 549. Paul testified that Neslund did not deny any of Robert's statements. Neslund, 50 Wn. App. at 553.

On appeal, Neslund argued the court erred in admitting "portions" of the testimony of Paul "recounting conversations he overheard between Neslund and their

brother Robert." Neslund, 50 Wn. App. at 549. Neslund argued the court erred in admitting the testimony as an adoptive admission because there was insufficient evidence to show she heard or understood the incriminating statements. Neslund, 50 Wn. App. at 549-50. "Neslund maintain[ed] that there is no evidence from which to infer that she heard or understood Robert's alleged remarks and that her silence therefore cannot imply acquiescence." Neslund, 50 Wn. App. at 552.

We concluded Paul's testimony was sufficient to show Neslund heard and understood the incriminating statements. Neslund, 50 Wn. App. at 553. Because Neslund "did not . . . deny the account," we held the court did not abuse its discretion in admitting the statements as adoptive admissions. Neslund, 50 Wn. App. at 553.

> [Paul's] testimony that he heard Neslund and Robert participate in a detailed conversation describing the killing of Rolf Neslund and the dismemberment and disposal of his body was sufficient to support a finding that Neslund heard and understood the incriminating statements and that she had the ability to, but did not, deny the account.

Neslund, 50 Wn. App. at 553. The court states the graphic account was of such a nature that it was reasonable to conclude an "innocent person would have responded had there been no intention to acquiesce." Neslund, 50 Wn. App. at 553.

Here, the text message transcript shows Hill received and responded to the text messages F.V.-L. sent and did not agree with the accusatory text message statements she made. The question is whether there were sufficient facts from which a jury could conclude Hill acquiesced or acceded in the truth of the statements. On appeal, the State characterizes the responses as "deflection." The State claims that under the circumstances, "deflection" is acquiescence because Hill did not disagree, deny, contradict, or object to the statements. We disagree.

First, as Hill points out, deflection is not the same as acquiescence. To "deflect" means "to turn aside : deviate from a straight line or from a position, course, or direction." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 592 (2002). To "acquiesce" means "to accept or comply tacitly or passively : accept as inevitable or indisputable." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 18. Second, unlike in Neslund, Hill responds to the accusatory text messages and does not acquiesce or accede to the assertions. Third, the circumstances presented by text message communication is different. Although text messages have much in common with other means of communication, it is "a unique form of communication" that is a truncated, "raw and immediate" means of communication. State v. Hinton, 179 Wn.2d 862, 873, 319 P.3d 9 (2014); State v. Roden, 179 Wn.2d 893, 901, 321 P.3d 1183 (2014). Text messages tend to be short, informal communications that may not directly respond; often "contain only a few words"; and are frequently comprised of colloquial abbreviations and acronyms. See Nissen v. Pierce County, 183 Wn.2d 863, 887, 357 P.3d 45 (2015). We conclude the trial court abused its discretion in ruling there were sufficient foundational facts from which a jury could conclude Hill acquiesced or acceded to the accusatory text message statements.[5]

---

[5] The out-of-state case the State cites in a statement of additional authorities is distinguishable. In State v. Martinez, 275 Or. App. 451, 452, 364 P.3d 743 (2015), the State charged the defendant with unlawful manufacture, possession, and delivery of methamphetamine. The court admitted text messages between Martinez and his girlfriend Ibarra to show that he " 'was really the king maker, the controller, the person who controlled the [drug] deals.' " Martinez, 275 Or. App. at 453 (alteration in original). On appeal, the court concluded a text message from Martinez that states, " 'How u nwo did u try it i got it over here' " was an "implied manifestation of [his] belief in the truth of Ibarra's statement." Martinez, 275 Or. App. at 462. The court also concluded Martinez's text message that " '[r]eally your doin it' " "communicate[d] his belief in, and commentary on, Ibarra's prior statement." Martinez, 275 Or. App. at 462-63.

Even if there were sufficient foundational facts to permit the State to introduce the text messages at trial, we hold the failure to instruct the jury on whether to consider the adoptive admissions was error.[6]

The trial court ruled that admission of the text messages was a preliminary determination and the jury would decide whether Hill adopted the accusatory statements. The court ruled, in pertinent part:

> Neslund reminds us that the jury is ultimately responsible for determining whether in light of all the surrounding facts, [Hill] actually heard and understood all of this. The court's function at this point is to make a preliminary determination as to whether or not the jury should hear this. I am making the determination that they can hear it. Ultimately, whether [Hill], according to Neslund, made an adoptive admission is thus a matter of conditional relevance to be determined by the jury.

The trial court correctly states that under Neslund, the jury must ultimately determine as a matter of fact whether Hill heard, understood, and acquiesced in the accusatory statement. But the court did not instruct the jury on adoptive admissions.

We hold the proponent of adoptive admissions must submit and the court must give an instruction to the jury that informs the jury that it cannot consider the text messages as evidence unless it finds under the circumstances that the defendant heard, understood, and acquiesced in the statements. The failure to instruct the jury on whether it could consider the text messages as adoptive admissions was error. However, we conclude that " 'within reasonable probabilities, had the error not occurred, the outcome of the trial would [not] have been materially affected.' " State v. Gresham,

---

[6] The record does not support the State's argument that the invited error doctrine precludes considering this argument on appeal.

16

173 Wn.2d 405, 433, 269 P.3d 207 (2012)[7] (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

An evidentiary error that does not result in prejudice is not grounds for reversal. State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). "The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." Bourgeois, 133 Wn.2d at 403. The erroneous admission of the text message exchange and the failure to instruct the jury on whether to consider the text messages as adoptive admissions was minor in the context of the other overwhelming evidence.

F.V.-L. testified in detail about the crimes of burglary in the first degree, unlawful imprisonment, and assault in the fourth degree. F.V.-L.'s testimony was corroborated by documentary evidence and the testimony of Sergeant Potter and J.V.

Sergeant Potter testified that when he responded to the 911 call, F.V.-L. had been crying and had blood on her mouth. Sergeant Potter took photographs of F.V.-L.'s injuries and documented her reported injuries on the Domestic Violence Supplemental Form. The Domestic Violence Supplemental Form depicts a blank face and body. On the form that depicts the face, Sergeant Potter wrote "hair pulled" on the scalp, "slaps/punches to face" on the nose, and "dried blood" at the corner of the mouth. On the diagram of a body, Sergeant Potter also notes "neck sore" and "back sore." The court admitted the photographs and the Domestic Violence Supplemental Form into evidence.

---

[7] Internal quotation marks omitted.

J.V testified about seeing the bruises on F.V.-L.'s arm and wrist the next day on July 15. J.V. also testified about finding the window screen that was on the ground outside and seeing greasy fingerprints on the inside of the window.

The court also admitted the photographs a King County victim advocate took of F.V.-L.'s bruises three days after the assault.

Without objection, F.V.-L. also testified that Hill called her several times after July 14, 2014 to apologize:

> [H]e kept calling me and the times he called me, I said — I told him what he did, and I said, "You know you broke into my house. You pulled the crap out of my hair for three and a half hours. You hurt me."
> Q:     . . . When you said that, how did he respond? What words did he use?
> A:     . . . [H]e's like, "[F.V.-L.], I'm sorry. Let's just talk about it." I don't know. He just seemed to be like acting like it was no big deal.

Although the State displayed and referred to the text messages during closing argument, the record shows the prosecutor focused on the corroborating physical evidence of F.V.-L.'s injuries and the testimony of F.V.-L., Sergeant Potter, and J.V.

Defense counsel argued during closing argument that the text messages showed F.V.-L. was "baiting" Hill to "see how he responds" and her text messages showed she was trying to "bait[ ]" Hill as part of her plan to "make him pay."

> [F.V.-L.] initiated this text to Mr. Hill, someone she was so pissed off at after this incident and so fearful, by saying, "Listen to this song." "I had a song I wanted him to listen to." It's almost as if she was baiting him. Once he answers that, I'll see how he responds and then I can throw in this non sequitur, and he doesn't respond. So, wham, he's guilty because he didn't deny.

We conclude admission of the text messages and the failure to instruct the jury on adoptive admissions did not within reasonably probabilities materially affect the outcome of the trial and affirm the jury convictions.[8]

Legal Financial Obligations

Hill argues the court should strike imposition of the mandatory victim penalty assessment (VPA) and the DNA collection fee.

In 2018, the legislature amended the legal financial obligation statutes. LAWS OF 2018, ch. 269. The legislature did not amend the mandatory language of the VPA statute, RCW 7.68.035(1)(a). The VPA statute states that when an individual is found guilty in superior court of a felony or gross misdemeanor, "there shall be imposed by the court upon such convicted person a penalty assessment." RCW 7.68.035(1)(a). We reject the argument that the court must consider indigency and ability to pay the mandatory VPA. See State v. Mathers, 193 Wn. App. 913, 918-21, 376 P.3d 1163, rev. denied, 186 Wn.2d 1015, 380 P.3d 482 (2016); State v. Clark, 191 Wn. App. 369, 374, 362 P.3d 309 (2015); see also State v. Shelton, 194 Wn. App. 660, 673-74, 378 P.3d 230 (2016), rev. denied, 187 Wn.2d 1002, 386 P.3d 1088 (2017).

By contrast, the legislature amended the DNA statute in 2018. LAWS OF 2018, ch. 269, § 18. As amended, the statute provides the court shall impose a collection fee of $100 for all crimes specified in RCW 43.43.754 "unless the state has previously collected the offender's DNA as a result of a prior conviction." RCW 43.43.7541.

---

[8] Because Hill cannot show prejudice, his ineffective assistance of counsel claim fails. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Hendrickson, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996).

Because there is no evidence in the record that Hill's DNA was previously collected, we deny the request to strike the DNA fee.[9]

We affirm the jury convictions of domestic violence burglary in the first degree, unlawful imprisonment, and assault in the fourth degree and deny the request to strike the VPA or DNA fee.

Schindler, J.

WE CONCUR:

Spearman, J.P.T.

Leach, J.

---

[9] In a statement of additional grounds, Hill submitted a "Request that Clerk Certify to State Attorney General that Actions Challenges Constitutionality of State Satu[t]e" and "Request to Clarify Statu[t]e." Because Hill does not cite to a Washington statute, we cannot review his argument. RAP 10.10(c).